OPINION OF THE COURT
C. Raymond Radigan, J.
This is a private placement adoption in which the adoptive *973 child was born to a surrogate mother who was artificially inseminated, the donor being the adopting father. The attorney representing the adoptive parents prepared what is commonly known as a "Surrogate Parenting Agreement”. Under the terms of that agreement, the surrogate mother is to receive $10,000 for bearing the child.
The court first had to be concerned with the validity of the adoption proceeding under the circumstances presented, to wit: an agreement entered into prior to conception of the child, the birth of the child, and the necessity that the child be placed in a suitable home. Moreover, by prearrangement, the child was delivered after birth to his natural father and his wife, who could not conceive, with the intent of all parties concerned that, through the statutory adoption procedures, the child ultimately be the child of his natural father and the father’s spouse. Secondly, and with equal importance, there was the possible violation of existing New York statutes in the paying of a fee to the surrogate mother. In addition and on its own motion, the court is reviewing the reasonableness of the attorney’s fee sought by the petitioners’ lawyer (Domestic Relations Law § 115 [7]; Social Services Law § 374 [6]).
With legalization of abortion and the development and widespread use of contraceptives, there has been an appreciable reduction in the number of available children for adoption by loving and wanting prospective adopting parents. Couples unable to have children who seek a child through the traditional methods of adoption, namely, adoption agencies and private placement adoptions, have been discouraged by the considerable wait for a child (usually 3 to 7 years) together with the uncertainty and, in many instances, the painful anxiety connected with the process. Through the use of sperm donors, surrogate mothers, and in vitro fertilization, science has sought to satisfy the childless couple’s demand for children. In an attempt to ease the process, scientific methods now provide a means for couples unable to have children whereby the child conceived and ultimately adopted may be genetically related to one or both of the adopting parents.
In the case of surrogate motherhood, the couple usually contracts with the surrogate mother who agrees: first, to be artificially inseminated with the couple’s husband as donor and to carry the child to full term; and second, to surrender all parental rights in the child as of the date of birth (Contracts to Bear a Child, 65 Cal L Rev 611 [1978]). For the courts, the most disturbing aspect of the "baby contract” is *974 the moral and ethical considerations, plus the question of the payment made to the surrogate mother for bearing the child. The reality is that the child is in being and of necessity must be reared by parents. The court, being confronted with the facts presented, has found that the child should be raised as the child of his biological father and the latter’s spouse since by court investigation it has been found that it would be in the best interests of the child to approve the adoption. No other alternative, such as denying the adoption for the purpose of discouraging such procedures, is appropriate here. This child needs a home and, under the circumstances, the home must be that of the petitioners. Thus, the court has granted the adoption.
Next to be considered is whether the court should permit the payment to the surrogate mother. The court must consider whether the payment should be disallowed so as to discourage the practice of "surrogate motherhood” and/or whether it should be disallowed because of statutory prohibitions. For the reasons developed hereafter, the court finds it is for the Legislature to determine if such payments should be disallowed so as to prevent such practices in the future.
All 50 States have enacted legislation to regulate adoptions, and due to the great demand for "desirable” children, many of these States impose criminal sanctions for compensation paid in connection with an adoption. These criminal sanctions are the Legislatures’ response to a growing "baby black market” where children are often auctioned to the highest bidder. With profit as their priority, there is little concern for the well-being of the child by the parties involved (Surrogate Motherhood: The Outer Limits of Protected Conduct, 1981 Det C L Rev 1131).
In New York, it is a misdemeanor for any person, corporation, agency, society, institution or other organization to willfully violate the provisions of its adoption statutes (Social Services Law § 389). Except for authorized agencies, this includes the prohibition against paying or accepting compensation in connection with the placing of a child for adoption or assisting a parent, relative or guardian of a child in arranging for the placement (Social Services Law § 374 [6]).
In keeping with the State’s desire to monitor abuses in adoptions, Domestic Relations Law § 115 (7) requires that in private placement adoptions: "The adoptive parent or parents shall also present an affidavit describing all fees, compensa *975 tion and other remuneration paid by such parent or parents on account of or incidental to the birth or care of the adoptive child, the pregnancy or care of the adoptive child’s mother or the placement or adoption of the child and on account of or incidental to assistance in arrangements for such placement or adoption”.
In Doe v Attorney General (106 Mich App 169, 307 NW2d 438), a husband and wife petitioned the court to declare unconstitutional sections of the Michigan Adoption Code which permits court review of any exchange of consideration in an adoption. Payments of consideration beyond court-approved expenses are precluded (Mich Comp Laws Ann § 710.54). The couple argued that the Michigan statute was an impermissible intrusion by the State into their rights of privacy. The couple relied on United States Supreme Court decisions, Griswold v Connecticut (381 US 479 [1965]) and Carey v Population Servs. Inti. (431 US 678 [1977]), which specifically held that the decision "whether or not to bear or beget a child” was among those protected by the constitutional right to privacy. The trial court determined that the couple’s agreement to pay a surrogate mother for carrying the husband’s child did not give rise to the level of conduct protected under the scope of the right of privacy. Moreover, even if the conduct were protected, there existed a compelling interest sufficient to warrant the State’s regulation of the plaintiff’s conduct. On appeal, the Court of Appeals of Michigan held that: "While the decision to bear or beget a child has thus been found to be a fundamental interest protected by the right of privacy, see Maher v Roe, 432 US 464, 97 S Ct 2376, 53 L Ed 2d 484 (1977), we do not view this right as a valid prohibition to state interference in the plaintiffs’ contractual arrangement. The statute in question does not directly prohibit John Doe and Mary Roe from having the child as planned. It acts instead to preclude plaintiffs from paying consideration in conjunction with their use of the state’s adoption procedures. In effect, the plaintiffs’ contractual agreement discloses a desire to use the adoption code to change the legal status of the child — i.e., its right to support, intestate succession, etc. We do not perceive this goal as within the realm of fundamental interests protected by the right to privacy from reasonable governmental regulation.” (Doe v Attorney General, supra, pp 173-174, p 441.)
While the Michigan Court of Appeals held that the couple had a fundamental right to bear a child with the aid of a *976 third party, it, nevertheless, determined that the couple’s constitutional right did not give the surrogate mother the right to bear a child for pay and use the adoption laws to transfer the child to the contracting couple. The net effect of the decision prohibits the use of surrogate mothers in the State of Michigan since few women other than perhaps a close family member would bear someone else’s child without compensation.
More recently, the Supreme Court of Kentucky was confronted with a surrogate mother situation containing facts similar to the Doe v Attorney General case (supra) and the one presently before this court. In Surrogate Parenting Assoc. v Commonwealth ex rel. Armstrong (704 SW2d 209 [Feb. 6, 1986]), the Attorney General sought to revoke the charter of Surrogate Parenting Associates Inc. for its involvement in surrogate parenting procedures in alleged violation of Kentucky’s adoption statutes:
A) Kentucky Revised Statutes § 199.590 (2), which prohibits sale, purchase or procurement for sale or purchase of "any child for the purpose of adoption”;
B) Kentucky Revised Statutes § 199.601 (2), which prohibits filing a petition for voluntary termination of parental rights "prior to five (5) days after the birth of a child”; and
C) Kentucky Revised Statutes § 199.500 (5), which specifies that a "consent for adoption” shall not "be held valid if such consent for adoption is given prior to the fifth day after the birth of the child.”
The contractual arrangement in the Surrogate Parenting Assoc, case (supra) is similar to the surrogate parenting agreement presented to this court in that the agreement is between the biological father, the surrogate mother and her husband. The biological father’s wife who is not genetically related to the child is not a party to the agreement. The purpose of not having the father’s wife part of the agreement, according to the Kentucky Court of Appeals, was to avoid the Kentucky adoption statute which forbids the purchase or sale of children.
The Supreme Court reversed the Court of Appeals which reversed the trial court’s decision finding for the defendant, Surrogate Parenting Associates. The Supreme Court focused on interpreting the statutory language to determine if Surrogate Parenting Associates’s involvement in surrogate parenting procedures should be construed as participating in the buying and selling of babies.
*977 In a 5 to 2 decision, the court held that "there are fundamental differences between the surrogate parenting procedure in which SPA participates and the buying and selling of children as prohibited by KRS 199.590 (2) which place this surrogate parenting procedure beyond the purview of present legislation.” (Surrogate Parenting Assoc. v Commonwealth ex rel. Armstrong, 704 SW2d, at p 211.)
The Kentucky statute and the New York statute were both designed to keep baby brokers from coercing expectant mothers or parents with financial inducements to part with their child. As stated by the Kentucky court, the central fact in the surrogate parenting procedure is that the agreement to bear the child is entered into before conception.
"The essential considerations for the surrogate mother when she agrees to the surrogate parenting procedure are not avoiding the consequences of an unwanted pregnancy or fear of the financial burden of child rearing. On the contrary, the essential consideration is to assist a person or couple who desperately want a child but are unable to conceive one in the customary manner to achieve a biologically related offspring. The problem is caused by the wife’s infertility. The problem is solved by artificial insemination. The process is not biologically different from the reverse situation where the husband is infertile and the wife conceives by artificial insemination.
"No one suggests that where the husband is infertile and conception is induced by artificial insemination of the wife that the participants involved, the biological father, the physicians who care for the mother and deliver the child, or the attorneys who arranged the procedure, have violated the statutes now in place.” (Surrogate Parenting Assoc. v Commonwealth ex rel. Armstrong, supra, pp 211-212.)
Surrogate Parenting Associates freely acknowledged that the contractual arrangements regarding the mother’s surrender of custody and termination of parental rights are voidable. Likewise, this court finds that such arrangements are not void, but are voidable because the individual State’s adoption statutes, which are designed to safeguard the best interests of the child, take precedence over any agreement between the parties. If violations of the adoption statutes are found in the terms of the parenting agreement, the court may find the contract illegal and deny the petition for adoption.
The dissenting opinions in the Surrogate Parenting Assoc. case (supra) view the surrogate mother arrangement for obtaining an adoptable child as no less than baby selling.
*978 However, this court, in spite of its strong reservations about these arrangements both on moral and ethical grounds, is inclined to follow the majority opinion by finding that biomedical science has advanced man into a new era of genetics which was not contemplated by either the Kentucky Legislature nor by the New York Legislature when it enacted Social Services Law § 374 (6) prohibiting payments in connection with an adoption. Current legislation does not expressly foreclose the use of surrogate mothers or the paying of compensation to them under parenting agreements. Accordingly, the court finds that this is a matter for the Legislature to address rather than for the judiciary to attempt to determine by the impermissible means of "judicial” legislation. In its absence, this court will not appropriate the function of the Legislature and prohibit such arrangements. As with any contractual arrangement, especially as it relates to adoptions, the court will continue to review such contracts and the circumstances surrounding them to determine whether there has been any overreaching, unfair advantage, fraud, undue influence, or excessive payments. In this matter it has concluded that the payment provided for under the agreement may be made.
However, the court requests the Legislature to review this serious problem in order to determine whether statutory provisions should be made to allow or disallow the payments requested herein and the practice of surrogate parenting. Accordingly, copies of this decision have been sent to the Law Revision Commission and the chairmen of the Judiciary Committees of the Senate and Assembly.
Insofar as the attorney’s fee is concerned, the courts possess both inherent and statutory power to regulate the practice of law which includes the authority to supervise the charging of legal fees (Gair v Peck, 6 NY2d 97; Matter of Male Infant B., 96 AD2d 1055).
The court has reviewed the legal services rendered in this matter, taking into account the criteria set forth in Matter of Potts (213 App Div 59, affd without opn 241 NY 593) and Matter of Freeman (34 NY2d 1), namely, the time spent by the attorney, the difficulties involved in this particular adoption, the nature of the services, the amount involved, the professional standing of counsel and the results obtained. Because of the difficulties connected with arranging the birth of the child by a surrogate mother and the additional legal work required in such an arrangement, the court finds that a fair and reasonable fee for the legal services rendered by the attorney *979 is $3,500, the amount requested in the attorney’s affidavit of services.
This decision is deemed an order of the court. No order need be submitted.
Proceed accordingly.