# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
October 1, 2013 Session Heard at Murfreesboro[1]

## IN RE BABY ET AL.

**Appeal by Permission from the Court of Appeals, Middle Section
Juvenile Court for Davidson County
No. 20116298PT150334      Betty K. Adams Green, Judge**

---

**No. M2012-01040-SC-R11-JV - Filed September 18, 2014**

---

A man and woman who were unable to have children together entered into a contract with a woman who consented to act as a surrogate. The surrogate's husband was also a party to the contract. The parties contracted for a "traditional surrogacy," which involves the artificial insemination of the surrogate, who, after giving birth, is meant to relinquish the child to the biological father and the intended mother. Prior to the birth of the child, all parties filed a joint petition asking the juvenile court to declare the paternity of the child, grant custody to the intended parents, and terminate the parental rights of the surrogate. A magistrate for the juvenile court granted the petition. Less than a month later, the surrogate gave birth, and, following the advice of medical personnel, the parties agreed that the surrogate should breastfeed the child for a short period of time in the interest of providing the best possible nutrition. When the child was almost one week old, the surrogate filed a series of motions asking the magistrate to vacate the prior order, set aside the surrogacy contract, and award her custody. The magistrate denied the motions, the juvenile court judge upheld the ruling, and the Court of Appeals affirmed. This Court granted the surrogate's application for permission to appeal to consider issues of public policy, subject matter jurisdiction, paternity, custody, and the termination of parental rights.

After careful consideration of these important questions, we hold that the public policy of this state does not prohibit the enforcement of traditional surrogacy contracts, but does impose certain restrictions. As is relevant here, our public policy requires compliance with the statutory procedures for the termination of parental rights and does not allow parties to terminate the parental rights of a traditional surrogate through judicial ratification of a

---

[1] Oral argument was heard in this case on October 1, 2013, at Middle Tennessee State University in Murfreesboro, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

surrogacy contract prior to the birth of the child. Accordingly, the contractual provisions in this case circumventing the statutory procedures for the termination of parental rights are unenforceable. We further hold that the juvenile court properly exercised jurisdiction over the issues of paternity and custody. We vacate the portion of the juvenile court's order terminating the parental rights of the surrogate, but otherwise affirm the judgments of the juvenile court and the Court of Appeals. Because the surrogate retains parental rights unless and until such rights are terminated in a future proceeding, we remand the case to the juvenile court to address the issues of visitation and child support.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed in Part and Reversed in Part; Case Remanded to the Juvenile Court**

GARY R. WADE, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER, CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined. WILLIAM C. KOCH, JR., J., filed a concurring opinion.

Shelley S. Breeding and Allison J. Starnes-Anglea (at trial and on appeal), Knoxville, Tennessee, and Benjamin G. Smith (at trial), Nashville, Tennessee, for the appellant, J.J.E.

Benjamin Papa and Kimberly K. Huguley, Brentwood, Tennessee, for the appellees, L.G. and A.T.

**OPINION**

**I. Facts and Procedural History**

In early 2010, L.G.[2] (the "Intended Father") and A.T. (the "Intended Mother") (collectively, the "Intended Parents"),[3] both of whom are citizens of Italy, engaged the services of a surrogacy agency in the United States after discovering that they were biologically incapable of having a child together. At that time, the Intended Parents had been in a relationship for some time but had not married because they were waiting for the Catholic Church to approve the annulment of the Intended Mother's previous marriage. The

---

[2] In order to preserve confidentiality, the Juvenile Court for Davidson County granted a request by the parties to be referred to by their initials in court records.

[3] The definition of the term "intended parent" in the area of surrogacy law is "an individual, married or unmarried, who manifests the intent . . . to be legally bound as the parent of a child resulting from assisted or collaborative reproduction." In re F.T.R., 833 N.W.2d 634, 643 (Wis. 2013) (quoting American Bar Association Model Act Governing Assisted Reproductive Technology § 102(19) (2008) (alteration in original)).

-2-

surrogacy agency arranged for the Intended Parents to contact J.J.E. (the "Surrogate") and her husband, J.M.M., both Tennessee residents.

The parties decided to go through with a surrogacy arrangement and negotiated the terms. Each couple was represented by legal counsel during the negotiations. In July of 2010, the Intended Parents, the Surrogate, and the Surrogate's husband entered into a contract that provided for the Surrogate to be artificially inseminated by the sperm of the Intended Father, and, in the event of a successful pregnancy, to relinquish the child to the custody of the Intended Parents at the time of birth. The contract included the following terms:

1. . . . [T]he Intended Parents[] are . . . over the age of twenty-one [and are] in a committed, loving, and stable relationship with one another. They desire to enter into this Agreement in order to have one or more children that are biologically related to one of them, and to take these children into their home and raise them as their parents.

2. The Surrogate . . . is an adult who . . . desires to enter into this Agreement in order to assist the Intended Parents to become parents.

. . . .

4. All parties to this Agreement . . . have full capacity to contract for themselves.

5. The purpose of this Agreement is to enable [the Intended Parents] to have a child together.

6. Neither the Surrogate nor the Surrogate's husband desires to have a parental relationship with any child or children born pursuant to this Agreement. Despite the fact that the Surrogate's eggs will be used to help create any child or children born pursuant to the Agreement, both she and her husband believe that any child or children she delivers as a result of this Agreement is morally, biologically, ethically, and contractually the child or children of the Intended Parents. In addition, [the] Surrogate states that she does not believe any action she takes pursuant to this Agreement makes her a "mother" or "parent" to the child or children she delivers. Such actions include, but are not limited to, producing eggs (genetic material), gestation, nourishing the child or children during pregnancy, making personal choices during the pregnancy that place the bests interests of the child or children above her own, and giving birth to the

-3-

child or children. . . .

7.  This Agreement in no way constitutes payment for a child, placement of a child, relinquishment of parental rights, or consent to adoption.

. . . .

11.  All parties acknowledge that legal issues surrounding surrogacy are an unsettled area of law in the state of Tennessee.  All parties acknowledge that statutes regarding domestic relations and court opinions in the area of domestic relations create certain presumptions and assumptions that are not appropriate in this matter, including but not limited to:

    a.  The woman who gives birth to the child is the child's "mother."

    b.  The woman who gives birth to a child is obligated to rear and support the child, along with her husband, if she is married.

    c.  The right to parent and raise a child lies with the woman who gave birth to the child and her husband, if she is married.

    The parties acknowledge that these and other presumptions of the law arise from cases or statutes that do not relate to pregnancies that result from surrogacy arrangements.  The parties . . . desire that any disputes that arise from or in connection with this Agreement, or that arise from any aspect of their relationship be resolved by application of the terms of this Agreement and the intentions of the parties as expressed in this document.

. . . .

18.  Avoidance of Parent-Child Bond by Surrogate and by Surrogate's Husband – The Surrogate and her husband understand and affirm that, in the best interests of any child born pursuant to the terms of this Agreement, neither will attempt to form any parent-child bond with any such child.

19.  Legal Recognition of Intended Parents' Parent-Child Relationship – The Surrogate and Surrogate's husband agree that . . . they will cooperate with any and all legal efforts on the part of the Intended Parents to secure legal recognition of the Intended Parents' parent-child relationships with the child or children the Surrogate will deliver pursuant to this Agreement . . . .

. . . .

[The Intended Parents] acknowledge that they are both obligated by this Agreement to take all necessary steps to finalize the legal recognition of the parent-child relationship between them and the child or children . . . .

22.  Custody – The Intended Parents shall take physical custody of the child or children immediately upon birth.  [The Surrogate] shall execute a Power of Attorney if necessary, immediately upon the birth of the child, granting the Intended Parents all rights to make all parental decisions relating to the child, including all medical decisions, and the right to take the child or children from the birthing facility after birth and care for the child or children pending any court proceedings that may be necessary to secure legal recognition of the parental relationship of the Intended Parents to the child or children born pursuant to this Agreement. [The Surrogate] acknowledges that the best interest of the child or children is served by the execution of the Power of Attorney called for in this paragraph and by the Intended Parents taking immediate custody of the child or children.

. . . .

49. . . . If any provision of this Agreement is deemed to be invalid or unenforceable by a [c]ourt of competent jurisdiction, such provision shall be severable from the remainder of this Agreement.  Any invalid or unenforceable provision of this Agreement shall not cause the remainder to be invalid or unenforceable. Any invalid or unenforceable provision of this Agreement deemed invalid or unenforceable due to its scope or breadth shall be deemed valid to the extent of the scope or breadth permitted by law.

(Emphasis added.)

The contract required the Intended Parents to pay the Surrogate for her pain and suffering, a portion of her legal fees, all medical expenses associated with the pregnancy not covered by insurance, and various other expenses, such as lost wages, transportation costs, housing costs, and maternity clothes.  The contract further provided that such payments should "not be construed as a fee for surrendering parental rights to a child pursuant to the provisions of any statute in the State of Tennessee, or otherwise." The contract described the payments by the Intended Parents as "consideration . . . to support the Surrogate during the course of her pregnancy, and to reimburse her for any expenses or injuries the Surrogate

-5-

incurs in the course of complying with the terms of this Agreement." The contract also authorized genetic testing to ensure that the Intended Father was in fact the biological father and provided that the Intended Parents would be entitled to recover for breach of contract in the event that anyone else was the biological father.

As a result of the artificial insemination, the Surrogate became pregnant in April of 2011. Over the course of the pregnancy, the Intended Parents paid the Surrogate approximately $42,000 to cover her medical and legal fees, and some $31,000 for pain, suffering, and other expenses related to the pregnancy and birth.

On November 7, 2011, two months prior to the birth of the child, the Intended Parents, the Surrogate, and the Surrogate's husband jointly filed a "Petition to Declare Parentage, to Ratify Surrogacy Agreement, and to Direct Issuance of Birth Certificate" in the Juvenile Court for Davidson County. In the petition, the Surrogate and her husband "affirm[ed] that neither of them [was] an Intended Parent of the [c]hild," and that they had "explicitly waived any parental rights they might theoretically have to the [c]hild in the parties' Agreement." The petition was signed by the attorney representing the Intended Parents. Both the Surrogate and her husband signed as "Pro se Co-Petitioners." By affidavit, the Surrogate attested to the following:

> 4. I voluntarily entered into the Surrogacy Agreement with [the Intended Parents], and the statements contained in that Agreement are true and correct.
>
> 5. An important part of my agreement with the [Intended Parents] is that I do not intend or desire to be a parent to the child who is the subject of the Agreement.
>
> 6. My sole purpose in undergoing the [artificial insemination] procedure was to facilitate the formation of the [Intended Parents'] family.
>
> . . . .
>
> 10. I am asking the [c]ourt to recognize [the Intended Parents] as the only legal parents of the child.
>
> . . . .
>
> 12. I believe it is in the child's best interest for [the Intended Parents] to be declared the legal parents of the child and for the [c]ourt to ratify the Surrogacy Agreement so that the [Intended Parents] can raise the child whom

they have brought into the world.

(Emphasis added.)

On December 21, 2011, seventeen days prior to the birth of the child, a juvenile court magistrate (the "Magistrate") issued an order approved by all parties (the "Consent Order"), which "forever terminated" the "rights and responsibilities that the [Surrogate and her husband] might theoretically claim with regard to the [c]hild, if any," and further declared the child to be "the lawful child of" the Intended Father, and that the Intended Parents be entitled to "full legal and physical custody of the [c]hild immediately upon birth." The Consent Order included the following findings of fact:

3. [The Intended Father] is . . . the genetic and biological father of the [c]hild.

. . . .

7. Pursuant to the Agreement and the parties' intent evidenced in the Agreement, the [Intended Parents] should have the sole right to physical and legal custody of the [c]hild immediately upon birth.

. . . .

9. The anticipated birth of the [c]hild is a surrogate birth pursuant to [Tennessee Code Annotated section] 36-[1-]102(48)(A)(ii).

. . . .

11. [The Intended Father] is the legal father of the [c]hild with all associated rights and responsibilities for the [c]hild immediately upon birth . . . .

12. The Surrogate is not the intended parent of the [c]hild despite the fact that she is the genetic and biological mother of the child.

13. The Surrogate is not a legal parent of the [c]hild and has no rights or responsibilities associated with the [c]hild immediately upon birth.

. . . .

17. All rights and responsibilities surrounding the impending birth of the [c]hild have been properly addressed through these proceedings, and all

necessary documents for the determination of parentage have been filed with
the [c]ourt.

18.  Entry of this Order is in the best interest of the [c]hild.

On January 7, 2012, the Surrogate gave birth to a girl, J.M.G. (the "Child").  The
Intended Parents were present for the birth.  Afterward, however, the Intended Mother
returned to Italy to care for her own mother and the mother of the Intended Father, both of
whom were ill.  Following the advice of medical personnel, the Intended Father and the
Surrogate agreed that the Surrogate should breastfeed the Child for a short period of time in
the interest of ensuring the best possible nutrition for the Child.  For several days following
the birth, the Surrogate kept and nursed the Child, and the Intended Father assisted daily in
the care of the Child.

Less than a week after the birth, the Surrogate obtained new counsel and filed a
"Motion to Alter or Amend" the Consent Order pursuant to Tennessee Rule of Civil
Procedure 59.04 and sought an "Emergency . . . Ex Parte Restraining Order and Injunction,"
claiming that because the Intended Parents had not yet married, "the birth of [the] Child did
not meet the requirements of a 'surrogate birth' under Tennessee law."  She asked the
Magistrate to vacate the Consent Order, grant the Surrogate temporary custody, and enter an
injunction prohibiting the Intended Parents from removing the Child from the jurisdiction.
On the same day the motions were filed, the Magistrate conducted a hearing, denied
injunctive relief, and reserved ruling on the motion to alter or amend.  The Magistrate further
ordered the Surrogate to relinquish physical custody of the Child to the Intended Father.[4]

On January 27, 2012, some three weeks after the birth, the Surrogate filed a third
motion, seeking to set aside the Consent Order pursuant to Tennessee Rule of Civil
Procedure 60.02.  She again asked the Magistrate to grant her relief on the basis that the
unmarried status of the Intended Parents precluded enforcement of the contract. Meanwhile,
on the same date, the Intended Parents were married in Williamson County.  Following a
hearing, the Magistrate denied the Surrogate's Rule 59.04 and Rule 60.02 motions. The
Surrogate appealed to the juvenile court, which affirmed the Magistrate's rulings. See Tenn.
Code Ann. § 37-1-107(e) (2014) (providing for a hearing in the juvenile court on matters
decided by a magistrate).

On further appeal to the Court of Appeals, the Surrogate argued (1) that the juvenile

_____

[4] Although the record is not clear as to the date that the Intended Father received physical
custody of the Child, the record indicates that the Child now resides with the Intended Parents in
Italy.

court lacked subject matter jurisdiction; (2) that the surrogacy contract was invalid because the Intended Parents were not married at the time of the contract; (3) that the juvenile court should have set aside the Magistrate's termination of the Surrogate's parental rights because she had not been represented by counsel at the time of termination; and (4) that the juvenile court should have set aside the award of custody because the Magistrate had failed to properly determine the best interests of the Child. In re Baby, No. M2012-01040-COA-R3-JV, 2013 WL 245039, at *3 (Tenn. Ct. App. Jan. 22, 2013). The Court of Appeals rejected each of these claims and affirmed the judgment of the juvenile court. Id. at *7. Because this matter involves issues of first impression related to surrogacy contracts, we granted the Surrogate's application for permission to appeal.

## II. Standards of Review and Principles of Statutory Interpretation

The issues before this Court involve different standards of review. Initially, subject matter jurisdiction presents a question of law, which this Court reviews de novo without a presumption of correctness. Chapman v. DaVita, Inc., 380 S.W.3d 710, 712-13 (Tenn. 2012) (quoting Northland Ins. Co. v. State, 33 S.W.3d 727, 729 (Tenn. 2000)). Our review of a ruling on a motion brought pursuant to Rule 59.04 or Rule 60.02, however, is limited. This Court may reverse only if the trial court has abused its discretion. Discover Bank v. Morgan, 363 S.W.3d 479, 487 (Tenn. 2012); Henry v. Goins, 104 S.W.3d 475, 482 (Tenn. 2003). A trial court abuses its discretion only when it applies an incorrect legal standard, reaches an illogical result, commits clear error in its assessment of the evidence, or relies upon flawed reasoning that results in an injustice. Armbrister v. Armbrister, 414 S.W.3d 685, 693 (Tenn. 2013) (quoting Gonsewski v. Gonsewski, 350 S.W.3d 99, 105 (Tenn. 2011)).

Further, each of the issues presented involves the interpretation of a statute or rule. The standard of review for statutory construction is de novo. State v. Edmondson, 231 S.W.3d 925, 927 (Tenn. 2007). When interpreting statutes, our primary function is to carry out legislative intent without broadening the statute beyond its intended scope. Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002). When a statute is clear, courts simply apply the plain meaning without complicating the task. Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004). "When a statute is ambiguous, however, we may reference the broader statutory scheme, the history of the legislation, or other sources." Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008). We must presume that every word in a statute has meaning and purpose and should be given full effect so long as the obvious intention of the General Assembly is not violated by doing so. In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005) (quoting Marsh v. Henderson, 424 S.W.2d 193, 196 (Tenn. 1968)). "[A] construction which places one statute in conflict with another is to be avoided, and we must endeavor to resolve any possible conflict between statutes in favor of each other in order to provide a harmonious operation of laws." Lovlace v. Copley, 418 S.W.3d 1, 20 (Tenn. 2013) (Graham v. Caples, 325 S.W.3d 578, 582 (Tenn. 2010)). Finally, when

interpreting a rule of civil procedure, we apply these same principles of statutory construction and the same standard of review. Lind v. Beaman Dodge, Inc., 356 S.W.3d 889, 895 (Tenn. 2011) (quoting Thomas v. Oldfield, 279 S.W.3d 259, 261 (Tenn. 2009)).

### III. Analysis

The Surrogate first maintains that juvenile courts lack jurisdiction over surrogacy cases. In the alternative, she asserts that, because the Intended Parents were not married at the time the surrogacy contract was created, they failed to comply with the surrogacy statute. Absent compliance with the surrogacy statute, she argues, the juvenile court erred by awarding custody without properly considering the best interests of the Child and by terminating her parental rights when she lacked legal representation. The Intended Parents argue to the contrary and seek an award for the attorneys' fees they have incurred in this appeal. Before addressing the issues presented by the parties, we will provide a brief overview of the development of surrogacy law in Tennessee and other states, and consider whether the public policy of our state prohibits the enforcement of a contract for a traditional surrogacy.

### A. Surrogacy

Surrogacy is generally defined as "[t]he process of carrying and delivering a child for another person." Black's Law Dictionary 1582 (9th ed. 2009). Surrogacy agreements are divided into two broad categories: (1) traditional surrogacy, "in which a woman provides her own egg, which is fertilized by artificial insemination, and carries the fetus and gives birth to a child for another person"; and (2) gestational surrogacy, "in which one woman (the genetic mother) provides the egg, which is fertilized, and another woman (the surrogate mother) carries the fetus and gives birth to the child." Id.; see also In re C.K.G., 173 S.W.3d at 720 (defining traditional and gestational surrogacy); In re F.T.R., 833 N.W.2d at 643 (identifying traditional and gestational as the "two broad categories of surrogacies"); 7 Samuel Williston, Treatise on the Law of Contracts § 16:22 (Richard A. Lord ed., 4th ed. 1992 & Supp. 2013) [hereinafter Williston].[5] The key distinction is that a traditional

---

[5] While courts have remained fairly consistent in their definition of traditional surrogacy, a number of different types of gestational surrogacy have been identified. As observed by one commentator,

Births resulting from the use of a surrogate parent include primarily one of the following arrangements: a traditional surrogacy arrangement wherein a surrogate mother is injected with the sperm of the husband or partner of a woman who is unable to become pregnant; a gestational surrogacy arrangement wherein a woman's eggs can be retrieved and inseminated with her partner's sperm and transferred to the

(continued...)

surrogate is the biological mother of the child, whereas a gestational surrogate has no genetic relation to the child. In re C.K.G., 173 S.W.3d at 720. Similarly, while in a traditional surrogacy the intended mother has no genetic relation to the child, the intended mother in a gestational surrogacy may be the biological mother. Id. ("A traditional surrogate mother . . . has a genetic connection to the child whom she nonetheless bears on behalf of others."); Blackburn, 39 U. Mem. L. Rev. at 352 ("In traditional surrogacy, the intended mother has no genetic connection with the child. . . . In gestational surrogacy, the child is genetically related to both the intended father and the intended mother.").

Surrogacy agreements—particularly traditional surrogacies—have presented numerous legal obstacles, which states have dealt with in different ways. In several states, courts have been required "to muddle through the surrogacy thicket" without legislative guidance, 7 Williston § 16:22, resulting in a significant divergence of opinion as to the propriety of traditional surrogacy contracts, compare In re Baby M, 537 A.2d 1227, 1240 (N.J. 1988) (concluding that traditional surrogacy contracts conflict with public policy as demonstrated by several state statutes related to adoption, custody, and termination of parental rights), with Surrogate Parenting Assocs., Inc. v. Commonwealth ex rel. Armstrong, 704 S.W.2d 209, 211 (Ky. 1986) (concluding that a surrogate parenting arrangement did not violate a statute that prohibited "the buying and selling of children"), superseded by statute, Ky. Rev. Stat. Ann. § 199.590(4), and In re F.T.R., 833 N.W.2d at 638 (concluding that, aside from provisions concerning the termination of parental rights, traditional surrogacy contracts are enforceable unless enforcement is contrary to the best interests of the child); see also J.F. v. D.B., 879 N.E.2d 740, 741-42 (Ohio 2007) ("[N]o public policy is violated when a gestational-surrogacy contract is entered into, even when one of the provisions requires the

[5](...continued)

uterus of another woman for gestation and birth; a gestational surrogacy with egg donation wherein a woman can be the gestational and birth mother as a result of a surrogate donor's egg being fertilized by the sperm of her husband or fertilized by a sperm donor; and a gestational egg and sperm donor surrogacy arrangement wherein a surrogate mother carries an embryo made of a donor egg that has been fertilized by another donor sperm. Further, developing technology includes the possibility of additional methods of reproduction such as the use of donor eggs altered to include the woman's genetic material.

Ardis L. Campbell, Annotation, Determination of Status as Legal or Natural Parents in Contested Surrogacy Births, 77 A.L.R.5th 567, § 2[a] (2000); see also Christen Blackburn, Note, Family Law—Who Is a Mother? Determining Legal Maternity in Surrogacy Arrangements in Tennessee, 39 U. Mem. L. Rev. 349, 352 (2009) [hereinafter Blackburn, 39 U. Mem. L. Rev.] (dividing surrogacy agreements into the categories of "traditional surrogacy, gestational surrogacy, and donor surrogacy").

gestational surrogate not to assert parental rights regarding children she bears that are of another woman's artificially inseminated egg.").

In approximately one-third of the states, legislatures have enacted statutes addressing surrogacy, the majority of which fall into one of three categories. First, some states have legislatively prohibited all surrogacy contracts, declaring their terms unenforceable and, in some instances, imposing criminal penalties for those who attempt to enter into or assist in creating such a contract. See, e.g., D.C. Code §§ 16-401(4)(A)–(B), -402(a) (prohibiting all "[s]urrogate parenting contracts" as defined by statute); Mich. Comp. Laws Ann. §§ 722.851–.863 (declaring surrogate parentage contracts, as defined by statute, to be "void and unenforceable" and imposing criminal penalties for participation in a "surrogate parentage contract for compensation" or a surrogacy contract involving a surrogate who is an unemancipated minor or who has a "a mental illness or developmental disability"). A second category of states prohibit only certain types of surrogacy contracts—typically those involving a traditional surrogacy. See, e.g., Ky. Rev. Stat. Ann. § 199.590(4) (prohibiting traditional surrogacy contracts, as defined by statute, without addressing gestational surrogacies); N.D. Cent. Code §§ 14-18-05, -08 (declaring traditional surrogacy agreements void but allowing gestational surrogacies by providing that "[a] child born to a gestational carrier is a child of the intended parents for all purposes and is not a child of the gestational carrier and the gestational carrier's husband, if any"). Finally, states in the third category authorize both traditional and gestational surrogacy contracts, subject to regulation and specified limitations. See, e.g., N.H. Rev. Stat. Ann. §§ 168-B:1 to -B:32 (generally permitting traditional and gestational surrogacy agreements subject to certain conditions, including a traditional surrogate's right to revoke the agreement within seventy-two hours of birth); Va. Code Ann. §§ 20-156 to 20-165 (generally permitting surrogacy contracts, as defined by statute, and providing a multi-step process for judicial pre-approval of such contracts); Wash. Rev. Code Ann. §§ 26.26.210–.260 (generally permitting traditional and gestational surrogacy agreements but prohibiting compensation beyond reasonable expenses and agreements involving a surrogate who is "an unemancipated minor female or a female diagnosed as having an intellectual disability, a mental illness, or developmental disability").[6]

---

[6] The two most commonly cited model acts dealing with surrogacy agreements are the American Bar Association Model Act Governing Assisted Reproductive Technology (2008) and article 8 of the Uniform Parentage Act (2002), drafted by the National Conference of Commissioners on Uniform State Laws. Both of these model acts fall into the third category of surrogacy statutes, allowing traditional and gestational surrogacy contracts subject to extensive regulation that includes judicial pre-approval, limits on compensation, and provisions concerning the revocation rights of the parties to the agreement.

Tennessee has a unique surrogacy statute that does not fit into any of the three categories described above. Housed in the "Definitions" section of the statutory chapter titled "Adoption," Tennessee's surrogacy statute provides, in its entirety, as follows:

(48)(A) "Surrogate birth" means:

(i) The union of the wife's egg and the husband's sperm, which are then placed in another woman, who carries the fetus to term and who, pursuant to a contract, then relinquishes all parental rights to the child to the biological parents pursuant to the terms of the contract; or

(ii) The insemination of a woman by the sperm of a man under a contract by which the parties state their intent that the woman who carries the fetus shall relinquish the child to the biological father and the biological father's wife to parent;

(B) No surrender pursuant to this part is necessary to terminate any parental rights of the woman who carried the child to term under the circumstances described in this subdivision (48) and no adoption of the child by the biological parent(s) is necessary;

(C) Nothing in this subdivision (48) shall be construed to expressly authorize the surrogate birth process in Tennessee unless otherwise approved by the courts or the [G]eneral [A]ssembly.

Tenn. Code Ann. § 36-1-102(48)(A)–(C) (2014).

The General Assembly passed this statute as only one of many modifications to our adoption laws in the mid-1990s. In re Swanson, 2 S.W.3d 180, 183-85 (Tenn. 1999) (discussing the history of Tennessee's adoption code); see generally Monica L. Allie, The New Adoption Law in Tennessee: A Controversial Sweeping Reform, 32 Tenn. B.J. 18 (1996). In 1993, surrogacy emerged as a topic to be considered by a special commission (the "Commission") created by the Senate "to study the adoption laws of Tennessee and to recommend any necessary legislative revisions." Resolution of May 19, 1993, SJR 17, 1993 Tenn. Pub. Acts 1050, 1050. The Commission addressed surrogacy in a meeting held on December 20, 1993, and heard testimony from a private social worker who was considering the use of a gestational surrogate in order to have a child. The social worker expressed frustration that as the provider of the egg, she might be required to pursue an adoption in order to secure legal recognition as the child's mother. She suggested that where the intended parents are the suppliers of the egg and the sperm, they should be considered

"parents outright." She added that it would be "natural," however, to require an intended mother in a traditional surrogacy to adopt.

Nearly a year later, the Commission issued a Draft Revision to the Adoption Code, dated November 28, 1994, which included the following provision:

> "Surrogate birth" means the union of the wife's egg and the husband's sperm which are then placed in another woman who carries the fetus to term and, pursuant to a contract, relinquishes the child to the biological parents pursuant to the terms of the contract. No surrender pursuant to this part is necessary to terminate any maternal parental rights of the woman who carried the child to term under these circumstances and no adoption by the biological parents is necessary. Nothing herein shall be construed to make legal the surrogate birth process in Tennessee unless otherwise approved by the courts of the [G]eneral [A]ssembly.

This definition of surrogate birth described only a gestational arrangement and made no reference to traditional surrogacy. During a meeting held on December 8, 1994, a Commission member commented that the Commission, while providing a definition for gestational surrogacy, had otherwise been unable to comprehensively address surrogacy, and that, in his opinion, the subject warranted further consideration apart from the adoption statutes.

Discussions during the December 8, 1994 meeting and a subsequent meeting on January 25, 1995, reflected a similar result, with the Commission ultimately deciding to leave for future consideration the complexities related to surrogacy. Several members of the Commission expressed concern that the definition in the Draft Revision encompassed only the most common meaning of gestational surrogacy and suggested the addition of language defining traditional surrogacy. By that point, bills had been introduced in both the Senate and the House designed to adopt the revisions recommended by the Commission, which were amended to include the following definition of traditional surrogacy: "The insemination of a woman by the sperm of a man under a contract by which the parties state their intent that the woman who carries the fetus shall relinquish the child to the biological father and the biological father's wife to parent."[7] Following several additional amendments unrelated to surrogacy, the General Assembly enacted the proposals as part of its overhaul of the adoption code. See Act of May 26, 1995, ch. 532, 1995 Tenn. Pub. Acts 951 (codified as amended at Tenn. Code Ann. §§ 36-1-101 to -206 (2014)).

---

[7] This is the definition currently codified at Tennessee Code Annotated section 36-1-102(48)(A)(ii).

-14-

Several months later, the General Assembly created an ad hoc legislative committee (the "Ad Hoc Committee") to evaluate the changes to the adoption code. On August 24, 1995, the Ad Hoc Committee heard testimony from a pediatric geneticist who suggested that gestational surrogates, as the women who carry and give birth to the child, had a potential basis to claim the status of a "biological parent" under the statutory definition of that term.[8] A member of the Commission disagreed, observing that the definition of "biological parent" in the newly adopted statute would not apply in the case of a gestational surrogacy and that an adoption would only be necessary in a traditional surrogacy. The Ad Hoc Committee took no action in response other than to recommend that the General Assembly consider whether the surrogacy definition was consistent with the other provisions of the adoption code.

### B. Public Policy of Tennessee

Since the enactment of Tennessee Code Annotated section 36-1-102(48), the General Assembly has not further addressed the propriety of traditional surrogacies. Because this "most fundamental question[]" has not been otherwise resolved, 7 Williston § 16:22, the determination of whether public policy prohibits the enforcement of a traditional surrogacy contract has become the obligation of this Court.

### 1. Principles of Public Policy

As a general principle, courts have not only the authority but also the responsibility to invalidate a private contract that is contrary to the public policy of this state. Baugh v. Novak, 340 S.W.3d 372, 382 (Tenn. 2011) (citing 5 Williston § 12:3). This authority, however, must be exercised with caution out of respect for the right of individuals to strike their own bargains, free from unnecessary interference and with the expectation that the courts will enforce a contract between competent parties. Id. at 383 ("[T]his Court has often 'held that public policy is best served by freedom of contract. . . .'" (second alteration in original) (quoting Chazen v. Trailmobile, Inc., 384 S.W.2d 1, 3 (Tenn. 1964))); see also Moyers v. City of Memphis, 186 S.W. 105, 109 (Tenn. 1916) ("[I]f there is one thing which more than another public policy requires, it is that [persons] of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice." (quoting Printing & Numerical Registering Co. v. Sampson, (1875) 19 L.R. Eq. 462 (Ch.) 465)).

---

[8] Then, as now, biological parents were defined as "the woman and man who physically or genetically conceived the child who is the subject of the adoption or termination proceedings or who conceived the child who has made a request for information pursuant to this part." Act of May 26, 1995, ch. 532, § 1, 1995 Tenn. Pub. Acts 951, 955 (codified at Tenn. Code Ann. § 36-1-102(10)).

-15-

In order to strike the proper balance between freedom of contract and competing policy interests, we have held that a contract is unenforceable on public policy grounds only when its terms clearly violate the public policy of our state. Baugh, 340 S.W.3d at 383-84. "[T]he public policy of Tennessee 'is to be found in its constitution, statutes, judicial decisions and applicable rules of common law.'" Cary v. Cary, 937 S.W.2d 777, 781 (Tenn. 1996) (quoting Crawford v. Buckner, 839 S.W.2d 754, 759 (Tenn. 1992)). In assessing whether a contract is inconsistent with public policy, courts may consider the purpose of the contract, whether any violation is inherent in the contract itself, as opposed to merely a collateral consequence, and, finally, whether the enforcement of the contract will have a detrimental effect on the public. Baugh, 340 S.W.3d at 383-84.

## 2. The Surrogacy Statute

The surrogacy statute includes the caveat that none of its provisions "shall be construed to expressly authorize the surrogate birth process in Tennessee unless otherwise approved by the courts or the [G]eneral [A]ssembly." Tenn. Code Ann. § 36-1-102(48)(C). In In re C.K.G., decided in 2005, this Court, while addressing the legal standing of an intended mother who gave birth using the eggs of an anonymous donor, described section 36-1-102(48)(C) as reflective of "a neutral legislative stance as to the validity and enforceability of surrogacy arrangements." 173 S.W.3d at 723 n.6.[9] Because "neutral" legislation cannot be interpreted as expressing a policy against the agreements defined in the surrogacy statute, our Court of Appeals ruled in this case that the surrogacy statute did not establish a public policy prohibiting traditional surrogacy agreements. See In re Baby, 2013 WL 245039, at *4. We agree.

The legislative history of the statute, as previously outlined, confirms the absence of any policy against traditional surrogacy. The Commission, tasked with recommending changes to the adoption code, proposed the statutory definition in response to the question of when an adoption should be required for children born pursuant to gestational surrogacy

---

[9] In re C.K.G. involved an arrangement referred to as "gestational surrogacy with egg donation," which entails "a woman carr[ying] and giv[ing] birth to a child as a result of fertilization and implantation of a third-party donor's egg." Id. at 720. There was no surrogacy contract in In re C.K.G., and the surrogate was the intended mother, whereas the biological mother had no further involvement following the donation of her egg. See id. Resolving a parentage dispute between the surrogate and her ex-boyfriend (the biological father), the Court adopted a multi-factor test for determining the maternal rights of the surrogate, ultimately concluding that she had standing to bring a parentage action against the father and to seek custody of their triplets. See id. at 727-30. The dispute in In re C.K.G. did not involve the question of whether surrogacy contracts are enforceable, and the ruling did not apply to a dispute between a surrogate and intended parents in a traditional surrogacy arrangement. Id. at 730.

agreements. The Commission expressed the view that the subject would require more study before the General Assembly could address it in a comprehensive fashion. Thus, the legislative history of the statute demonstrates that the General Assembly chose not to adopt a policy prohibiting the enforcement of traditional surrogacy contracts when it passed the surrogacy statute in 1995 and, since then, has declined to speak further on the subject.[10]

### 3. Statutes Prohibiting Unlicensed Adoption and the Sale of Children

We next consider the policy implications of Tennessee Code Annotated section 36-1-108, which prohibits unregulated adoption, and section 36-1-109, which imposes criminal penalties for illegal payments in connection with the surrender of a child or "the placement of a child for adoption." Section 36-1-108(a) provides that "[n]o person, corporation, agency, or other entity, except the [Department of Children's Services] or a licensed child-placing agency or licensed clinical social worker . . . shall engage in the placement of children for adoption." The statute further provides that "placement of a child or children for adoption" occurs when

> (b) . . . a person, corporation, agency, or other entity is employed, contracted, or engaged, in any manner for any remuneration, fee, contribution, or thing of value, of any type by, or on behalf of, any person:
>
> (1) In the selection of prospective adoptive parents for a child by determining the relative qualifications of prospective adoptive parents in a decision by that person, corporation, agency, or other entity to place any child or children, including specifically, but not limited to, the preparation of home studies, preliminary home studies, court reports for surrenders or adoptions, or the provision of supervision of a child in an adoptive home as part of the adoptive process; or
>
> (2)(A) In the business of arranging services or assistance directed primarily, and not as an incidental part of its primary business, toward bringing to or placing with prospective adoptive parents a child or children for the purpose of foster care leading to adoption or as an adoptive placement for a child or children, including, but not limited to, advertising for such services, accepting clients for a fee, or providing

---

[10] Although the concurring opinion by Justice Koch implies that nothing can be gleaned from Tennessee Code Annotated section 36-1-102(48) or its history, our General Assembly, when addressing the issue, clearly chose not to prohibit surrogacy contracts, despite the opportunity to do so. Our responsibility is to interpret the law as written. Our conclusion does not preclude the General Assembly from considering the public policy issue at some point in the future.

any placing services for a fee.

(B) Nothing in subdivision (b)(2)(A) shall include the provision of reasonable and necessary legal services related to the adoption proceedings, or medical or counseling services for the child or the parent in connection with the child's birth or in connection with the parent's decision to relinquish the child for adoption or for counseling services for the prospective adoptive parents.

Tenn. Code Ann. § 36-1-108(b)(1)–(2). Section 36-1-109 provides, in pertinent part, as follows:

(a) It is unlawful for any person, corporation, agency, or other entity other than the [Department of Children's Services] or a licensed child-placing agency or licensed clinical social worker . . . that is subject to regulation by the department to:

(1)(A) Charge or receive from or on behalf of any person or persons legally adopting or accepting a child for adoption any remuneration, fee, contribution, or thing of value whatsoever for rendering any service described in [section] 36-1-108 in connection with the placement of such child for adoption or in connection with the placement of such child for foster care or adoption with one other than the child's parent(s) other than that now or hereafter allowed by law;

. . . .

(2) Sell or surrender a child to another person for money or anything of value; and it is unlawful for any person to receive such minor child for such payment of money or thing of value . . . ;

(3) Having the rights and duties of a parent or guardian with respect to the care and custody of a minor child, assign or transfer such parental or guardianship rights for the purpose of, incidental to, or otherwise connected with, selling or offering to sell such rights and duties for money or anything of value; or

(4) Assist in the commission of any acts prohibited in subdivision (a)(1), (a)(2), or (a)(3).

Id. § 36-1-109(a)(1)–(4) (emphasis added). The statute also describes the types of payments

-18-

that are permitted:

>     (B)(i) <u>This section shall not be construed to prohibit the payment by any interested person of reasonable charges or fees for hospital or medical services for the birth of the child, or for medical care and other reasonable birth-related expenses for the mother and/or child incident thereto, for reasonable counseling fees for the parents or prospective adoptive parents and/or child, for reasonable legal services or the reasonable costs of legal proceedings related to the adoption of any child or for reasonable, actual expenses for housing, food, maternity clothing, child's clothing, utilities or transportation</u> for a reasonable period not to exceed ninety (90) days prior to or forty-five (45) days after the birth or surrender or parental consent to the adoption of the child, unless a court with jurisdiction for the surrender or adoption of a child, based upon detailed affidavits of a birth mother and the prospective adoptive parents and such other evidence as the court may require, specifically approves in a written order, based upon a motion filed by the prospective adoptive parents for that purpose, any expenses specifically allowed in this subdivision (a)(1)(B) for a period prior to or after the periods noted above.

>     (ii) <u>Such expenses must be incurred directly in connection with the maternity, birth, and/or placement of the child for adoption, or for legal services or for costs of legal proceedings directly related to the adoption of the child, or for counseling</u> for a period of up to one (1) year for the parent who surrenders the child or consents to the adoption of the child;

>     (iii) The payment for such expenses may only be for expenses or costs actually incurred during the periods permitted in subdivisions (a)(1)(B)(i) and (ii). This shall not be construed to prohibit the actual payment or receipt of payment for such expenses or costs after those periods that were actually incurred during those periods.

Id. § 36-1-109(a)(1)(B)(i)–(iii) (emphasis added). A violation of section 36-1-109 is a Class C felony. Id. § 36-1-109(b).

Courts in other jurisdictions have arrived at different conclusions as to whether their "baby-selling" statutes evince a policy against traditional surrogacy contracts. In In re Baby M, the New Jersey Supreme Court held that a traditional surrogacy contract ran afoul of a state law that prohibited "paying or accepting money in connection with any placement of a child for adoption." 537 A.2d at 1240 & n.4. The intended parents agreed to pay $10,000 to the surrogate, unconnected with expenses related to the birth, upon the surrender of the

-19-

child by the surrogate and the termination of her parental rights. Id. New Jersey's highest court ruled that because the intended parents had paid for the adoption of a child and the surrogate had accepted payment for the adoption, the contract "worked to frustrate the goals of the statute." Id. at 1241. In contrast, the Kentucky Supreme Court concluded that a traditional surrogacy contract did not conflict with a state law prohibiting the "purchase of any child for the purpose of adoption or any other purpose, including termination of parental rights." Armstrong, 704 S.W.2d at 211 & n.2 (quoting Ky. Rev. Stat. Ann. § 199.590(2) (1984) (amended 1998)). The Kentucky court found that "fundamental differences" distinguish traditional surrogacy arrangements from "the buying and selling of children as prohibited by" the state baby-selling statute, most notably the fact that in a traditional surrogacy, unlike the typical adoption scenario, "the agreement to bear the child is entered into before conception." Id. at 211. The Kentucky court further observed that "[t]he process is not biologically different from the reverse situation where the husband is infertile and the wife conceives by artificial insemination." Id. at 212.

Our conclusion is that neither Tennessee Code Annotated section 36-1-108 nor section 36-1-109 establishes a public policy prohibiting the enforcement of traditional surrogacy contracts. The primary policy consideration underlying statutes such as sections 36-1-108 and -109 is to prevent "commercial considerations from overwhelming prospective mothers." 7 Williston § 16:22. As stated in Armstrong, this concern is mitigated considerably when the agreement to bear the child occurs prior to the surrogate becoming a "prospective mother," as is the case with traditional surrogacy agreements. See 704 S.W.2d at 211; see also In re Baby Girl L.J., 505 N.Y.S.2d 813, 817 (Sur. Ct. 1986) (finding that a traditional surrogacy agreement "was not contemplated by . . . the New York legislature when it enacted [the statute] prohibiting payments in connection with an adoption"). Although a traditional surrogacy agreement may culminate in an adoption by the intended mother, the nature of the payment in the context of surrogacy is different because, as commentators have observed, a surrogate is typically "paid to help create a child, not to 'sell' one she is already carrying." Jennifer L. Watson, Growing a Baby for Sale or Merely Renting a Womb: Should Surrogate Mothers Be Compensated for Their Services?, 6 Whittier J. Child & Fam. Advoc. 529, 547 (2007) [hereinafter Watson, 6 Whittier J. Child & Fam. Advoc.]; Stacy Christman Blomeke, Note, A Surrogacy Agreement That Could Have and Should Have Been Enforced: *R.R. v. M.H.*, 689 N.E.2d 790 (Mass. 1998), 24 U. Dayton L. Rev. 513, 529 (1999). This distinction is consistent with our statute, which prohibits payment in exchange for the surrender of a child but is silent as to payment for the services of a surrogate in the conception of a child. See Tenn. Code Ann. § 36-1-109(a)(2).

Although sections 36-1-108 and -109 do not preclude the enforcement of traditional surrogacy contracts, they do impose certain limitations as to the types of compensation that are permissible in such contracts. Initially, section 36-1-108(a)(2)–(3) proscribes payments

in exchange for the surrender of a child or the termination of parental rights. In order to comply with the public policy reflected in these provisions, compensation to a traditional surrogate should not be contingent upon her surrender of the child or the termination of her parental rights. See Watson, 6 Whittier J. Child & Fam. Advoc. at 547 (arguing that compensation in surrogacy contracts should be permissible so long as "[s]urrogates are not paid for the babies they ultimately produce, but are instead paid for their pregnancy services, including becoming pregnant, carrying the child to term, and giving birth"); cf. Doe v. Att'y Gen., 487 N.W.2d 484, 487, 489 (Mich. App. 1992) (holding that a surrogacy contract may be enforced so long as any compensation "is solely for conception or surrogate gestation services" and not for the "relinquishment of parental rights"); In re Baby M, 537 A.2d at 1241 (rejecting argument that payment was for surrogate's services where payment was contingent upon termination of the surrogate's parental rights).

Moreover, in furtherance of the goal of avoiding improper financial considerations, the statutes disallow payments unrelated to the following: (1) reasonable legal services related to the adoption process; (2) medical and counseling services related to the birth, relinquishment, or adoption of the child; or (3) other matters related to the pregnancy and the birth of the child, including expenses such as "housing, food, maternity clothing, child's clothing, utilities or transportation." Tenn. Code Ann. §§ 36-1-108(b)(2)(B), -109(a)(1)(B)(i). These limitations further guard against the harm that some courts and commentators have hypothesized may occur when financial concerns exert an improper influence on a potential surrogate. See, e.g., Doe, 487 N.W.2d at 489 (expressing concern that "[s]urrogacy-for-profit arrangements have the potential for demeaning women by reducing them to the status of 'breeding machines'"); In re Baby M, 537 A.2d at 1249 (expressing concern that surrogacy-for-profit arrangements may allow intended parents to take advantage of a potential surrogate's "need for money"); In re Baby Girl L.J., 505 N.Y.S.2d at 818 (indicating that "excess payments" in surrogacy contracts should not be permitted). Consistent with the policies underlying sections 36-1-108 and -109, we hold that the terms of a surrogacy contract pertaining to compensation will only be enforceable to the extent that they are not contingent upon the surrogate's surrender of the child or the termination of her parental rights, and to the extent that they reflect the reasonable costs of services, expenses, or injuries related to the pregnancy, the birth of the child, or other matters inherent to the surrogacy process.[11]

---

[11] Section 36-1-109(a)(1)(B)(i)–(iii) contains several provisions limiting payments to costs that accrue during particular time periods relevant to the birth or surrender or parental consent to the adoption of the child. These time limitations, however, fail to account for the fact that many expenses associated with surrogacy agreements occur long before the birth of the child, such as the costs associated with artificial insemination and pre-birth genetic testing for the purpose of

(continued...)

## 4. Custody Statute

Because traditional surrogacy agreements require courts to make a determination as to the custody of a child, we must also consider the effect of Tennessee Code Annotated section 36-6-106(a) (2014), which provides, in pertinent part, that "in any . . . proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child." The statute further provides fifteen factors for the court to consider,[12] "where applicable," and directs

---

[11](...continued)
determining paternity. Because these timing provisions are not essential to the policy embodied by the statute, we decline to hold that public policy requires surrogacy contracts to comply with such provisions in order to be enforceable.

[12] The enumerated factors are as follows:

(1) The strength, nature, and stability of the child's relationship with each parent . . . ;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities . . . ;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . . ;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(continued...)

the court to consider "the location of the residences of the parents, the child's need for stability[,] and all other relevant factors." Id. § 36-6-106(a).

Our prior decisions establish that when courts are required by statute to make a determination based on the best interests of a child, the parties cannot use a private agreement to relieve the court of its obligation to conduct an independent inquiry. Tuetken v. Tuetken, 320 S.W.3d 262, 272 (Tenn. 2010) (holding that parents may not enter into an arbitration agreement that would "relieve the trial court of its duty to ensure that disputes between parents are resolved in the best interests of the children"); Berryhill v. Rhodes, 21 S.W.3d 188, 194 (Tenn. 2000) (holding that parents may not enter into private agreements that circumvent statutory child support obligations). Any agreement that purports to settle the question of a child's best interests is not binding on the court. Tuetken, 320 S.W.3d at 272 ("[P]arents cannot bind the court with an agreement affecting the best interest of their children.").

In light of these principles, we hold that courts are not bound by any surrogacy contract as to the determination of the best interests of a child. We are mindful, however,

---

[12](...continued)
(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. . . . ;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. . . . ;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a)(1)–(15). This statutory language reflects a recent amendment to section 36-6-106(a) that took effect on July 1, 2014. See Act of Apr. 4, 2014, ch. 617, §§ 4, 8, 2014-2 Tenn. Code Ann. Adv. Legis. Serv. 24, 25-26 (LexisNexis). Prior to the 2014 amendment, the statute provided ten factors for courts to consider when making custody determinations. See id. § 36-6-106(a)(1)–(10) (2010 & Supp. 2013). The prior version of the statute was in effect during the juvenile court proceedings in this case.

that in determining whether a contract is unenforceable on public policy grounds, courts must interpret the contract so as to uphold its validity, if possible, and "invalidate only those portions of the contract that are unenforceable." Baugh, 340 S.W.3d at 384. Accordingly, when faced with a surrogacy contract containing terms regarding the best interests of a child, courts should determine the best interests of the child as required by section 36-6-106(a) and, if possible, enforce the remainder of the contract. Although not binding, courts may consider the terms of a surrogacy contract as a factor in the best interest analysis, particularly when they reflect the parties' expressed intent as to the best interests of the child at the time they entered into the contract. See Tenn. Code Ann. § 36-6-106(a) (directing courts to consider "all . . . relevant factors" in assessing the best interest of a child); cf. Tuetken, 320 S.W.3d at 272 (concluding that courts may consider factors resulting from parties' agreements, such as a determination resulting from non-binding arbitration, in ruling on parentage issues). In most instances, enforcing the parenting scheme as provided by a surrogacy contract will support the best interests of the child. As observed by the Supreme Court of Wisconsin, surrogacy agreements "allow[] the intended parents to plan for the arrival of their child, reinforce[] the expectations of all parties to the agreement, and reduce[] contentious litigation that could drag on for the first several years of the child's life." In re F.T.R., 833 N.W.2d at 649-50. Accordingly, these agreements tend to "promote[] stability and permanence in family relationships" and, therefore, can advance the interests of the child. See id. On the other hand, the "expos[ure] to contentious family relationships" from protracted disputes concerning a child can cause significant harm. See id. at 650. In the context of surrogacy, a contract may allow intended parents to plan for a child, limit litigation, and enhance familial stability; these are all properly considered as "relevant factors" in the best interest inquiry required by section 36-6-106(a). Nevertheless, when there is a conflict between the contractual terms and the best interests of a child, the best interests as determined by the trial court pursuant to section 36-6-106(a) must be given priority. See Tuetken, 320 S.W.3d at 271 ("Tennessee statutes, taken together, impose a duty on trial courts to protect the best interests of children."); Holloway v. Bradley, 230 S.W.2d 1003, 1006 (Tenn. 1950) ("The supreme rule to which all others should yield is the welfare and best interest of the child.").

### 5. Statutes Defining Legal Parents and the Termination of Parental Rights

Our statutes defining legal parents and establishing how a parent's rights may be terminated also have relevant policy implications. Our adoption code provides that a woman may qualify as the "[l]egal parent" of a child in two ways: (1) by being "[t]he biological mother of a child," Tenn. Code Ann. § 36-1-102(28)(A); or (2) by being "[a]n adoptive parent of a child," id. § 36-1-102(28)(E).[13] Once a woman attains the status of a legal parent,

---

[13] In In re C.K.G., this Court recognized a limited exception to these definitions for an intended mother who gave birth using a donated egg, finding that the adoption statutes did not apply

(continued...)

her parental rights may only be terminated in three ways. First, if there is a statutory ground for termination and the termination of the mother's rights is in the best interests of the child, an involuntary termination may be warranted. Tenn. Code Ann. § 36-1-113(c).[14] Second, when a mother consents to adoption, her parental rights may be terminated as part of the adoption proceeding. See id. §§ 36-1-102(15)(C), -117(g). Third, a biological mother may relinquish her rights by executing a "surrender," which is defined as

> a document executed under the provisions of [section] 36-1-111, or under the laws of another state or territory or country, by the parent or guardian of a child, by which that parent or guardian relinquishes all parental or guardianship rights of that parent or guardian to a child, to another person or public child care agency or licensed child-placing agency for the purposes of making that child available for adoption[.]

Id. § 36-1-102(47); see also In re Angela E., 303 S.W.3d 240, 247-48 (Tenn. 2010) (describing the required procedure for executing a surrender).[15]

None of these statutes demonstrate a public policy prohibiting the enforcement of traditional surrogacy agreements. Taken together, however, these statutes establish who qualifies as a legal parent and the manner in which parental rights may be terminated. A person's status as a "legal parent" gives rise to numerous rights and obligations, all of which are subject to supervision and enforcement by the courts; likewise, any effort to terminate parental rights involves judicial scrutiny. See, e.g., In re Angela E., 303 S.W.3d at 249 (requiring courts to find that all requirements for involuntary termination are present, even

---

[13](...continued)
in the specific circumstances of that case. See 173 S.W.3d at 722-23. The Court specified that the holding in In re C.K.G. was not designed to control cases involving traditional surrogacies. Id. at 730.

[14] Statutory grounds for the involuntary termination of parental rights include circumstances such as abandonment by the parent, substantial noncompliance with the terms of a permanency plan, and child abuse. See id. § 36-1-113(g). None of these grounds are at issue in this case.

[15] A surrender requires approval by a juvenile, circuit, or chancery court, see Tenn. Code Ann. § 36-1-111(b), but unlike "parental consent," a surrender need not be filed in the same proceeding as the petition for adoption and may be filed prior to the filing of the petition for adoption. Neither parental consent nor surrender may occur prior to the birth of the child, id. § 36-1-111(d)(2), and, unless the court grants a waiver for good cause shown, "[n]o surrender or parental consent shall be valid that is made within three (3) calendar days subsequent to the date of the child's birth, such period to begin on the day following the child's birth," id. § 36-1-111(d)(3).

where the parent does not contest the termination of his or her rights).

Other state courts considering traditional surrogacy agreements have declined to allow parties to circumvent statutory procedures in regard to the termination of a surrogate's parental rights. When considering the validity of a traditional surrogacy agreement, a California appellate court found that absent compliance with statutory procedure, the surrogacy contract was insufficient "to deprive the 'surrogate' of the legal parental tie she would otherwise possess." In re Marriage of Moschetta, 30 Cal. Rptr. 2d 893, 894, 900 (Ct. App. 1994). Likewise, the Supreme Court of Wisconsin found that the statutes providing for termination of parental rights include procedural safeguards that the parties were not entitled to circumvent via private agreement. In re F.T.R., 833 N.W.2d at 651; see also Armstrong, 704 S.W.2d at 213 (holding that terms of a surrogacy contract are voidable to the extent that they conflict with the termination of parental rights statute).

Like these courts, we conclude that the enforcement of a traditional surrogacy contract must occur within the confines of the statutes governing who qualifies as a legal parent and how parental rights may be terminated. See also Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc., 395 S.W.3d 653, 668 (Tenn. 2013) ("It is well established that the laws affecting enforcement of a contract, and existing at the time and place of its execution, enter into and form a part of the contract." (quoting Kee v. Shelter Ins. Co., 852 S.W.2d 226, 228 (Tenn. 1993))). Just as parents may not use a private agreement to deprive courts of their designated role in determining the best interests of a child in a custody determination, see Tuetken, 320 S.W.3d at 272, a parent may not avoid judicial oversight of the termination of parental rights by the terms of a contract. Hence, a traditional surrogate, as the biological mother of the child, is a legal parent until her parental rights are terminated through one of our statutory procedures. See Tenn. Code Ann. § 36-1-102(28)(A). In a traditional surrogacy, an intended mother—who, by definition, is not genetically related to the child—may only attain the status of a legal parent through adoption. See id. § 36-1-102(28)(E).

As stated, whenever possible, courts should interpret a contract in a way that supports its validity and invalidates only the offending contractual terms. In many instances, a court will be able to successfully sever any improper terms related to the termination of parental rights while effectuating the main purpose of the agreement. See, e.g., In re F.T.R., 833 N.W.2d at 651 (finding that provisions requiring termination of parental rights were severable because the agreement primarily pertained to the "custody and placement" of the child).

### 6. Other Miscellaneous Statutes

While several other statutes touch upon elements of surrogacy contracts, none supply a basis for declaring traditional surrogacy contracts unenforceable on public policy grounds.

For example, Tennessee Code Annotated section 68-3-306 (2013) provides that "[a] child born to a married woman as a result of artificial insemination, with consent of the married woman's husband, is deemed to be the legitimate child of the husband and wife." This statute does not apply in the context of a traditional surrogacy because the statute contemplates an agreement between a husband and wife to have a child, which they intend to raise, via the artificial insemination of the wife's egg, typically as a result of infertility on the part of the husband. See In re C.K.G., 173 S.W.3d at 728; see also R.R. v. M.H., 689 N.E.2d 790, 795 (Mass. 1998) (holding that artificial insemination statute did not apply "to the child of a married surrogate mother" because it was limited to "the status of a child born to a fertile mother whose husband, presumably infertile, consented to her artificial insemination with the sperm of another man so that the couple could have a child biologically related to the mother"); Jane Marie Lewis, Note, New-Age Babies and Age-Old Laws: The Need for an Intent-Based Approach in Tennessee to Preserve Parent-Child Succession for Children of Assisted Reproductive Technology, 43 U. Mem. L. Rev. 479, 481 (2012) (noting that section 68-3-306 concerns only "the straightforward situation" in which a married couple wishes to have a child together through artificial insemination).

Of similarly limited relevance are Tennessee Code Annotated sections 36-2-401 to -403 (2014), which provide "a single means to establish parentage of children born of donated embryo transfer to [a] recipient intended parent," id. § 36-2-401. Under these provisions, the custodian of an embryo—defined as "the person . . . who hold[s] the legal rights and responsibilities for a human embryo"—may enter into a written contract relinquishing all rights and responsibilities regarding the embryo to an intended recipient parent. Id. §§ 36-2-402(1), -403(a)(1)–(2). A child born pursuant to this procedure shall be considered the child of each intended parent who is a party to the contract, without any further requirement to terminate the genetic parents' rights or for the intended parents to adopt. Id. § 36-2-403(d). Because traditional surrogacies do not involve donated embryo transfers, this procedure is not directly applicable to the facts before us; however, these provisions are indicative of a policy geared toward the accommodation of assisted reproductive technology, which further supports the conclusion that the public policy of our state does not forbid traditional surrogacy contracts.

### 7. Tennessee Constitution

Pursuant to the "law of the land" provision of article I, section 8 of the Tennessee Constitution,[16] the privacy rights of parents entitle them "to care for children without unwarranted state intervention unless there is a substantial danger of harm to the children."

---

[16] Article I, section 8 provides, in its entirety, "That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

In re Swanson, 2 S.W.3d 180, 187 (Tenn. 1999) (citing Hawk v. Hawk, 855 S.W.2d 573, 579 (Tenn. 1993)). Thus, "before a parent's rights can be terminated, there must be a showing that the parent is unfit or that substantial harm to the child will result if parental rights are not terminated." Id. at 188; see also In re Adoption of A.M.H., 215 S.W.3d 793, 809 (Tenn. 2007). These constitutional concerns, however, come into play only in proceedings to terminate parental rights that are "involuntary in nature." In re Angela E., 303 S.W.3d at 249; see also Tenn. Code Ann. § 36-1-113(c). Neither article 1, section 8 nor any other provision of our constitution requires a showing of substantial harm to the child where the termination of parental rights is voluntary in nature. Thus, no such showing is constitutionally required for courts to terminate parental rights upon the execution of a surrender, see Tenn. Code Ann. § 36-1-111, or parental consent to an adoption, see id. § 36-1-117(g).

Under this framework, parties to a traditional surrogacy contract may properly carry out the contractual terms by complying with any of the available statutory methods for terminating a biological mother's parental rights. If the termination proceedings are of a voluntary nature, then termination may occur without a showing that a surrogate is unfit or that substantial harm to the child will occur absent termination. If a surrogate contests the termination of her parental rights, however, and the termination proceedings take on an involuntary nature, then the statutory procedures for safeguarding a parent's constitutional rights must be satisfied before contractual terms relating to termination can be enforced.

### 8. Contract Law

Finally, the policy underlying the common law of our state does not forbid traditional surrogacy agreements. To the contrary, "[c]ontract law in Tennessee plainly reflects the public policy allowing competent parties to strike their own bargains." Ellis v. Pauline S. Sprouse Residuary Trust, 280 S.W.3d 806, 814 (Tenn. 2009). Tennessee common law recognizes a number of contractual defenses, including fraud, duress, undue influence, mistake, or incapacity. See Barnes v. Barnes, 193 S.W.3d 495, 500 (Tenn. 2006) (discussing duress); Rawlings v. John Hancock Mut. Life Ins. Co., 78 S.W.3d 291, 297, 301 (Tenn. Ct. App. 2001) (discussing fraud, duress, and undue influence); Williams v. Botts, 3 S.W.3d 508, 509-10 (Tenn. Ct. App. 1999) (discussing mistake). Like any other contract, surrogacy contracts are subject to these defenses, which may be raised in an independent declaratory judgment action, see Tenn. Code Ann. § 29-14-102 (2012), or as a defense in an action brought by another party to enforce the contract, see In re F.T.R., 833 N.W.2d at 649 (finding that generally applicable contract defenses are available in an action to enforce a traditional surrogacy agreement). While these defenses, if substantiated by proof, may invalidate a particular surrogacy contract, none prohibit the enforcement of traditional surrogacy agreements on public policy grounds.

In summary, the public policy of our state does not preclude the enforcement of traditional surrogacy contracts. Their enforceability, however, is not without bounds. Compensation may not be contingent upon the surrender of the child or the termination of parental rights, and compensation is restricted to the reasonable costs of services, expenses, or injuries related to the pregnancy, the birth of the child, or other matters inherent to the surrogacy process. Moreover, the terms of a surrogacy contract may not dispense with a judicial determination of the best interests of the child. Likewise, the terms of a surrogacy contract may not circumvent the statutes governing a person's status as a legal parent or the statutory procedures for terminating parental rights. Finally, termination of parental rights in an involuntary proceeding may not occur absent a finding that the parent is unfit or that substantial harm to the child will result if parental rights are not terminated.

## 9. Public Policy Applied

Having concluded that traditional surrogacy contracts do not violate public policy as a general rule, we turn to the question of whether any terms of the contract at issue are unenforceable on public policy grounds. The Surrogate argues that the contract violated the "public policy in favor of the best interest determination dictating the decree of custody," and that the juvenile court failed to conduct an adequate best interest analysis. We disagree.

The surrogacy contract provided for the Intended Father to take "physical custody" of the child or children immediately upon birth and included a provision in which the Surrogate "acknowledge[d] that the best interest of the child . . . [was] served . . . by the Intended Parents taking immediate custody of the child [upon birth]." Interpreting the contract in a way that upholds its validity, as we must, this language reflects the parties' intent as to who would take physical custody following the birth, as well as the Surrogate's acknowledgment that the best interests of the Child would be served in the custody of the Intended Parents.

Consistent with this interpretation, the record does not indicate that the juvenile court considered the contract binding as to its best interests analysis. To the contrary, the Consent Order, approved for entry by all parties, awarded custody to the Intended Father upon birth based upon a determination by the juvenile court that the award of custody was "in the best interest of the Child." The Surrogate characterizes the Consent Order as failing to give sufficient consideration to the factors enumerated in Tennessee Code Annotated section 36-6-106; however, in context, many of the enumerated factors of section 36-6-106(a) were simply inapplicable in this instance, and the Surrogate has made no attempt to explain how those that do apply would fail to support an award of custody to the Intended Father. As indicated, the juvenile court was entitled to consider the terms of the contract and the parties' expressed intent as to the best interests of the Child. The juvenile court here also was entitled to consider the fact that the Surrogate had joined the petition to ratify the surrogacy contract

and, in an affidavit attached to the petition, had attested to her continued belief that it was "in the [C]hild's best interest for [the Intended Parents] to be declared the legal parents of the [C]hild." Under these circumstances, we find no violation of public policy with regard to the award of custody.

Moreover, we find no basis to conclude that the terms of the surrogacy contract relating to monetary compensation rendered the contract unenforceable. No portion of the compensation was contingent upon the surrender of the Child or the termination of the parental rights of the Surrogate. While the record generally indicates that the Intended Parents paid approximately $42,000 to cover the Surrogate's medical and legal fees, and an additional $31,000 for the pain, suffering, and other expenses related to the pregnancy and birth, there is no specific information as to the timing or amounts of the payments. The surrogacy contract does specify, however, that all payments are related to legal and medical costs, or are meant to compensate the Surrogate for "expenses or injuries the Surrogate incurs in the course of complying with the terms of [the surrogacy contract]." Neither party asserts that the payments exceeded the reasonable costs of services, expenses, or injuries related to the pregnancy, the surrogacy process, or the birth of the Child. While we recognize the significant amounts paid by the Intended Parents to the Surrogate pursuant to the contract, the limited proof in this record does not supply any basis to conclude that the payments were impermissible.

The terms of the surrogacy contract regarding the status of the parties as legal parents are more problematic. In particular, the contract provides that "any child or children [the Surrogate] delivers as a result of this Agreement is . . . biologically . . . and contractually the child or children of the Intended Parents." The contract further provides that no "action [the Surrogate] takes pursuant to this Agreement makes her a 'mother' or 'parent' to the child or children she delivers," including the use of her "eggs (genetic material)."

Because the Surrogate is the biological mother of the Child, see Tenn. Code Ann. § 36-1-102(10), she qualifies as a legal parent, see id. § 36-1-102(28)(A). Our statutes provide no mechanism by which a biological birth mother—including a traditional surrogate—may use a contract to avoid attaining the status of a legal parent or to negate parental status prior to the birth of a child. Had the General Assembly intended to authorize such a procedure, it could have done so, as evidenced by the enactment of a statutory procedure permitting the custodian of an embryo to enter into a written contract relinquishing all rights and responsibilities regarding the embryo to an intended recipient parent. See id. §§ 36-2-402(1), -403(a)(1)–(2). As noted, parties to a traditional surrogacy contract must comply with our statutory procedures in order to terminate the parental rights of a traditional surrogate. Our statutory procedures unequivocally prohibit the voluntary relinquishment of a biological birth mother's parental rights prior to birth through either surrender or parental consent to

-30-

adoption. Id. § 36-1-111(d)(2). Thus, the provisions of the contract at issue that attempt to circumvent statutory procedure by terminating or negating the parental rights of the Surrogate prior to birth contravene the public policy of our state. Those provisions are therefore unenforceable and without legal effect.

The invalidity of these contractual provisions does not, however, preclude the enforcement of the contract as a whole. The enforcement of the remaining terms of the contract comports with the parties' intent as expressed in the severability clause of the contract, which provides that "any provision . . . deemed to be invalid or unenforceable . . . shall be severable from the remainder of [the contract]," and "shall not cause the remainder to be invalid or unenforceable." See Penske Truck Leasing Co. v. Huddleston, 795 S.W.2d 669, 671 (Tenn. 1990) (explaining that courts should consider the intent of the parties, as reflected in the terms of the contract, in determining whether a portion of a contract is severable from the remaining terms).

While our public policy does not preclude the enforcement of the remaining terms of the contract, none provides a basis for the juvenile court's termination of the Surrogate's parental rights. The contract specifies that it "in no way constitutes . . . relinquishment of parental rights." Moreover, as indicated, our public policy requires parties to operate within the confines of our statutory procedures in securing the termination of a biological mother's parental rights, which include involuntary termination, see Tenn. Code Ann. § 36-1-113, parental consent to adoption, see id. §§ 36-1-102(15)(C), -117(g), and surrender, see id. §§ 36-1-102(47), -111(d), none of which may occur prior to the birth of a child. Here, the Intended Parents contend that the surrogacy statute provides an additional, independent procedure for terminating parental rights by providing that "[n]o surrender pursuant to this part is necessary to terminate any parental rights of the woman who carried the child to term under the circumstances described in this subdivision (48) and no adoption of the child by the biological parent(s) is necessary." Id. § 36-1-102(48)(B). The Surrogate agrees with this interpretation, but contends that the surrogacy statute cannot serve as a basis for termination in this instance because the Intended Parents were not married at the time that the surrogacy contract was created or at the time of the juvenile court's termination of the Surrogate's parental rights.[17]

Contrary to the interpretation advanced by the parties, we conclude that the General Assembly did not intend for section 36-1-102(48)(B) to operate as an independent procedure for the termination of the parental rights of a traditional surrogate. As noted, the surrogacy

---

[17] The Surrogate expressly concedes that if we determine that the conditions of the surrogacy statute were satisfied, then the juvenile court properly terminated her parental rights pursuant to the surrogacy statute. We are not required to accept this concession.

statute defines surrogacy under two different circumstances: "gestational surrogacy" in subsection (A)(i) and "traditional surrogacy" in subsection (A)(ii). With gestational surrogacy, the surrogate is not the biological mother of the child, and the parties do not intend that the surrogate will be the child's legal mother. Under these circumstances, the gestational surrogate has no parental rights recognized under Tennessee law.[18] This is consistent with the language in section 36-1-102(48)(B) that "[n]o surrender . . . is necessary to terminate any parental rights" of a gestational surrogate. Similarly, because the intended parents are the biological parents, no adoption of the child by them is necessary. See Tenn. Code Ann. § 36-1-102(48)(B) (stating that "no adoption of the child by the biological parent(s) is necessary"). It is apparent, therefore, that the General Assembly did not intend to enact a procedure for termination of parental rights under the circumstances of gestational surrogacy. Instead, section 36-1-102(48)(B) operates as a statement of public policy that a woman who carries a fetus to term under the statutory definition of gestational surrogacy does not attain the status of a legal parent under Tennessee law and, therefore, the statutory procedures governing surrender and adoption do not apply.

In a traditional surrogacy, in contrast, the surrogate is the biological and legal mother of the child. As with gestational surrogacy, no adoption of the child by the biological father is necessary. In the context of traditional surrogacy, however, the meaning of the language of section 36-1-102(48)(B)—that "[n]o surrender pursuant to this part is necessary to terminate any parental rights of [the biological mother]"—is ambiguous. While a surrender is one procedure for terminating parental rights, the surrogacy statute is silent as to whether any other statutory procedure—for example, parental consent to adoption or involuntary termination—is necessary to terminate any parental rights of a traditional surrogate. In our view, it would be inconsistent with the other provisions in the adoption code, as well as the neutral stance on surrogacy expressed in section 36-1-102(48)(C), to construe this silence to mean that none of the other statutory procedures is necessary to terminate the parental rights of a traditional surrogate.

As previously discussed, the legislative history indicates that the language in section 36-1-102(48)(B) originated with only gestational surrogacy in mind. Consistent with the legislative history, we conclude that section 36-1-102(48)(B) serves to clarify that no termination of "any" parental rights of a gestational surrogate is necessary, but does not

---

[18] The definition of gestational surrogacy in section 36-1-102(48)(A)(i) differs from the situation in In re C.K.G., where the gestational surrogate gave birth using a donated egg, the parties intended for the gestational surrogate to be the legal mother, and the biological mother who donated the egg had not contested the gestational surrogate's parentage claim. 173 S.W.3d at 722-23, 730.

operate as an additional independent procedure for termination.[19]

In summary, the statutory procedures for terminating the parental rights of a traditional surrogate are limited to involuntary termination, parental consent to adoption, and surrender. Because neither the parties nor the juvenile court complied with any of these procedures in this instance, the portion of the juvenile court's order terminating the parental rights of the Surrogate must be set aside. See In re Angela E., 303 S.W.3d at 247-48, 254-55 (discussing the statutory requirements that must be satisfied for surrender or involuntary termination). Our ruling does not preclude the termination of the parental rights of the Surrogate in a future proceeding. Absent a basis for involuntary termination, however, termination may only occur if the Surrogate executes a surrender or consents to a petition for adoption.[20]

Furthermore, unless and until termination of the parental rights of the Surrogate occurs, she will retain both the rights and the responsibilities associated with legal parenthood. Accordingly, the case must be remanded to the juvenile court for a determination of visitation pursuant to Tennessee Code Annotated sections 36-6-101 to -612 (2014) and child support pursuant to Tennessee Code Annotated sections 36-5-101 to -3111 (2014).

### C. Subject Matter Jurisdiction

We next consider the Surrogate's contention that the juvenile court lacked subject matter jurisdiction. Subject matter jurisdiction refers to a court's authority to adjudicate a particular case or controversy and "depends on the nature of the cause of action and the relief sought." Chapman, 380 S.W.3d at 712. Courts have subject matter jurisdiction only when conferred by statute or by a provision of the state or federal constitution. Id.; Northland, 33 S.W.3d at 729. The party asserting subject matter jurisdiction bears the burden of proof. Chapman, 380 S.W.3d at 712 (citing Redwing v. Catholic Bishop for the Diocese of Memphis, 363 S.W.3d 436, 445 (Tenn. 2012)).

As a preliminary consideration, the Intended Parents contend that the Surrogate failed to present the subject matter jurisdiction claim in the juvenile court and, therefore, has

---

[19] Because we conclude that the surrogacy statute does not constitute an independent procedure for the termination of parental rights, we decline to reach the Surrogate's argument regarding the marital status of the Intended Parents.

[20] We recognize the possibility that the Intended Parents may pursue a stepparent adoption in the future in an attempt to establish the legal parenthood of the Intended Mother. See Tenn. Code Ann. § 36-1-102(28)(E). Aside from the public policy matters discussed above, we decline to comment on the issues that may arise in such an action.

waived the issue on appeal. Issues related to subject matter jurisdiction, however, are not subject to waiver. In re Estate of Smallman, 398 S.W.3d 134, 148 (Tenn. 2013) ("Subject matter jurisdiction is non-waivable and must be considered by an appellate court."); Landers v. Jones, 872 S.W.2d 674, 675 (Tenn. 1994) ("[S]ubject matter jurisdiction cannot be waived . . . ."). In consequence, if the juvenile court lacked jurisdiction as to a particular subject matter, its ruling as to that issue is a nullity. In re Estate of Trigg, 368 S.W.3d 483, 489 (Tenn. 2012) ("[T]he orders and judgments entered by courts without jurisdiction over the subject matter of a dispute are void . . . .").

As to whether the juvenile court had subject matter jurisdiction in these circumstances, we first observe the obvious—that our statutes offer limited guidance as to how courts should handle surrogacy disputes. As is relevant here, Tennessee Code Annotated section 36-1-102(48)(A)(ii) defines the term "surrogate birth" as "[t]he insemination of a woman by the sperm of a man under a contract by which the parties state their intent that the woman who carries the fetus shall relinquish the child to the biological father and the biological father's wife to parent." Section 36-1-102(48)(B) specifies that "[n]o surrender . . . is necessary to terminate any parental rights of the woman who carried the child to term under the circumstances described in this subdivision (48) and no adoption of the child by the biological parent(s) is necessary."

Because section 36-1-102(48) is located within the adoption chapter of the Tennessee Code, the Surrogate argues that the statute necessarily implicates "issues of adoption," which "only a chancery or circuit court has proper jurisdiction to hear." The Intended Parents, on the other hand, contend that "in surrogacy cases such as the one at bar, . . . no adoption is necessary, and therefore the court in which adoptions properly occur is irrelevant in this matter."

A primary consideration is that juvenile courts "may exercise only such jurisdiction and powers as have been conferred on them by statute." In re D.Y.H., 226 S.W.3d 327, 330 (Tenn. 2007). Thus, we must determine whether each aspect of the Consent Order fell within the jurisdiction of the juvenile court as established by statute.

### 1. Paternity

Consistent with several provisions in the surrogacy contract designed to ensure the Intended Father's paternity of the Child, the juvenile court first concluded that "[the Intended Father qualifies as] . . . the genetic and biological father of the Child." The jurisdictional basis for a finding of paternity is Tennessee Code Annotated section 36-2-307 (2014), which

provides that juvenile courts, concurrently with all trial courts of general jurisdiction,[21] shall have jurisdiction over proceedings to establish paternity or parentage, unless a petition for adoption involving the same child has been filed. Tenn. Code Ann. § 36-2-307(a)(1), (c)(1)–(4); see also Price v. Bright, No. E2003-02738-COA-R3-CV, 2005 WL 166955, at *7 (Tenn. Ct. App. Jan. 26, 2005) (holding that a juvenile court has "subject matter jurisdiction over [a] petition to establish paternity" pursuant to section 36-2-307(a)(1)); P.E.K. v. J.M., 52 S.W.3d 653, 660 (Tenn. Ct. App. 2001) (holding that chancery and juvenile courts have concurrent jurisdiction "over matters involving paternity").[22]

In this instance, no petition for adoption had been filed at the time the juvenile court entered the Consent Order establishing paternity. The juvenile court, therefore, properly exercised its authority to establish paternity, as provided by section 36-2-307(a)(1). Neither the placement of the surrogacy statute within the adoption chapter nor the possibility of a future adoption proceeding diminishes the juvenile court's power to determine paternity issues.

**2. Custody**

Following the confirmation of paternity, the juvenile court found the Intended Father to be "the legal father of the Child with all associated rights and responsibilities for the Child immediately upon birth, including full decision-making authority." The Consent Order directed that "the [Intended Parents] shall have the sole right to physical and legal custody of the Child immediately upon birth."

Tennessee Code Annotated section 36-2-311(a)(9) (2014) provides that any court determining paternity is authorized to "make an order declaring the father of the child," which is to include, among other things, a "[d]etermination of the custody of the child." See also Price, 2005 WL 166955, at *7 (concluding that where a juvenile court properly had jurisdiction to establish paternity, "[i]t necessarily follows that the [j]uvenile [c]ourt also had subject matter jurisdiction over the initial custody determination" pursuant to section 36-2-311(a)(9)). Accordingly, once paternity was established, section 36-2-311(a)(9)

---

[21] Trial courts of general jurisdiction include circuit and chancery courts. In re D.Y.H., 226 S.W.3d at 330 & n.2.

[22] Upon the filing of an adoption petition, the adoption court assumes exclusive jurisdiction over all parentage issues, and any pending or subsequent parentage complaint filed in the juvenile court must be transferred to the adoption court upon the motion of any party, the juvenile court, or the adoption court. Tenn. Code Ann. § 36-2-307(c)(2)–(3).

empowered the juvenile court to make an initial determination of custody effective upon the birth of the Child.[23]

### 3. Termination of Parental Rights

The jurisdiction of a juvenile court to order the termination of parental rights depends upon the basis asserted for termination. For example, juvenile courts have jurisdiction to accept a surrender or to order termination on an involuntary basis in a separate proceeding related to a future adoption; however, they do not have the authority to adjudicate a petition for adoption or to order termination as part of an adoption proceeding, as these matters are within the exclusive jurisdiction of the circuit and chancery courts. See id. § 36-1-102(16)(A) (providing that the term "[c]ourt," as used in the adoption statutes, refers generally to "the chancery or circuit court" and only includes the juvenile court for certain specified purposes, such as the acceptance of a surrender and the involuntary termination of parental rights); id. § 36-1-113(a) (authorizing juvenile courts to order the involuntary termination of parental rights); see also id. § 37-1-103 (2014) (providing matters within the exclusive original jurisdiction of the juvenile courts); id. § 37-1-104 (providing matters within the concurrent jurisdiction of the juvenile courts).

As noted, in this instance, neither the parties nor the juvenile court followed any of the statutory procedures for the termination of parental rights. Our determination that the juvenile court lacked any cognizable basis for termination pretermits our consideration of whether the juvenile court had the jurisdictional authority to terminate the Surrogate's parental rights.

### D. Tennessee Rule of Civil Procedure 60.02

The Surrogate's only remaining contention is that the juvenile court should have granted her relief pursuant to Tennessee Rule of Civil Procedure 60.02 because her parental rights were terminated without adequate legal representation. In light of our holding that there was no basis for the termination of the parental rights of the Surrogate, this issue is likewise pretermitted.

---

[23] An alternative basis for juvenile court jurisdiction over the paternity and custody of a child is found in Tennessee Code Annotated section 37-1-104(f) (2014), which provides that "[n]otwithstanding any provision of law to the contrary," juvenile courts have concurrent jurisdiction with circuit and chancery courts to adjudicate "proceedings to establish the paternity of children born out of lawful wedlock and to determine any custody, visitation, support, education or other issues regarding the care and control of children born out of wedlock." Because the juvenile court in this instance had jurisdiction under Tennessee Code Annotated sections 36-2-307(a)(1) and 36-2-311(a)(9), we need not address whether section 37-1-104(f) would also serve as a basis for the exercise of jurisdiction.

## E. Appellate Attorneys' Fees

Finally, the Intended Parents seek an award of attorneys' fees, contending that the Surrogate acted in bad faith by attempting to obtain custody without offering to reimburse the monies paid to her pursuant to the surrogacy contract. This Court may award appellate attorneys' fees when an appeal is "frivolous or taken solely for delay." Tenn. Code Ann. § 27-1-122 (2000). Because this appeal does not meet either of these criteria, an award of attorneys' fees is not warranted.

## F. Need for Legislative Action

As illustrated in this instance, surrogacy is an area of the law that involves "far-reaching, profoundly complex, and competing public policy considerations." In re C.K.G., 173 S.W.3d at 730. While we have relied upon our current laws to resolve the issues in this case, the General Assembly is the more appropriate branch of government to address the regulation of surrogacy agreements in a comprehensive fashion. See id. at 731 ("The General Assembly is better suited than the courts to . . . decid[e] whether generally to subject procreation via technological assistance to governmental oversight, and if so, to determine what kind of regulation to impose."); see also In re Marriage of Moschetta, 30 Cal. Rptr. 2d at 903 ("Once again the need for legislative guidance regarding the difficult problems arising from surrogacy arrangements is apparent."); In re F.T.R., 833 N.W.2d at 653 (observing that "[s]urrogacy is currently a reality in our . . . court system" and urging the state legislature to enact legislation so that all parties understand "the expectations and limitations" involved in the surrogacy process). Our surrogacy statute—which defines surrogacy but lacks a clear process for persons to create, carry out, and enforce traditional surrogacy agreements—leaves parties to surrogacy contracts and courts ill-equipped to deal with the complex questions that inevitably arise in this area of the law. We encourage our General Assembly to follow the lead of other state legislatures that have enacted statutes to address the fundamental questions related to surrogacy. Legislation could provide useful guidance by addressing whether the different types of surrogacy arrangements are compliant with public policy, what requirements the parties must satisfy in order to create an enforceable surrogacy contract, what procedures are available to address disputes arising out of surrogacy agreements, and which courts have jurisdiction to adjudicate those disputes.

## IV. Conclusion

The public policy of our state does not prohibit the enforcement of traditional surrogacy contracts but does prohibit the following: (1) compensation that is contingent upon the surrender of the child, is contingent upon the termination of the surrogate's parental rights, or exceeds the reasonable costs of services, expenses, or injuries related to the pregnancy, the birth of the child, or other matters inherent to the surrogacy process; (2) binding agreements as to the best interests of a child; (3) contractual terms that would circumvent the established procedures for determining a person's status as a legal parent or terminating parental rights;

and (4) termination of parental rights in an involuntary proceeding absent a finding that the parent is unfit or that substantial harm to the child will result if parental rights are not terminated.

In this instance, the contractual provisions circumventing the statutory procedures for the termination of parental rights are unenforceable. Because there was no cognizable basis for the termination of the Surrogate's parental rights, we vacate that portion of the Consent Order; otherwise, the judgments of the juvenile court and Court of Appeals are affirmed. The case is remanded to the juvenile court to determine visitation and child support. Costs are taxed one-half to the Surrogate and her surety and one-half to the Intended Parents and their surety, for which execution may issue if necessary.

_____
GARY R. WADE, CHIEF JUSTICE