FILED
10/15/2021
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 18, 2021 Session

## PAMELA ESTELLE HARRISON ET AL. v. SHANNON NICOLE HARRISON

**Appeal from the Circuit Court for Montgomery County**
**No. CC18CV168      Ted A. Crozier, Judge**

_____

### No. M2020-01140-COA-R3-CV

_____

This case involves a same-sex divorce and the resultant child custody issues regarding two children born during the marriage through artificial insemination. The sperm donor intervened in the divorce proceeding requesting the court establish him as the children's legal father and award him parenting time. The trial court denied his request to be named the children's legal father based on its interpretation and application of Tenn. Code Ann. § 68-3-306, Tennessee's artificial insemination statute. The sperm donor appeals, challenging the court's refusal to name him as a parent or award him visitation. We affirm the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

B. Nathan Hunt and Cole Prescott Corder, Clarksville, Tennessee, for the appellant, Joseph Bryan Compton.

Katie Bell Klinghard, Clarksville, Tennessee, for the appellee, Shannon Nicole Harrison.

Gregory D. Smith and  Crystal Dawn Wilkerson, Clarksville, Tennessee, for the appellee, Pamela Estelle Harrison.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

Pamela Estelle Harrison and Shannon Nicole Hickman were married on February 25, 2011.[1] Shannon took Pamela's last name of Harrison.[2] The women were married in Iowa, because Tennessee did not recognize same-sex unions at the time of their marriage. Pamela had a son from a prior relationship, but the couple wished to have children of their own, so Shannon conceived via artificial insemination. Specifically, Joseph Compton provided semen in a urine specimen cup, with which Shannon was inseminated. Pamela and Shannon were acquainted with Mr. Compton because he was Pamela's son's football coach. Mr. Compton was married at the time of the artificial inseminations.

Two children were conceived through Shannon's artificial inseminations—a daughter Chevelle Harrison (born in Tennessee in March 2014) and a daughter Stacei Harrison (also born in Tennessee in October 2015). Pamela's name was not included on Chevelle's birth certificate; however, Pamela's name was included on Stacei's birth certificate.[3] The children call Pamela "Mommy," and they call Shannon "Mama." After the children were born, Mr. Compton did not take on the role of father in any way.

Pamela filed for divorce on January 24, 2018 in the Montgomery County Circuit Court on the ground of irreconcilable differences. She also requested that her name be added to Chevelle's birth certificate. On February 2, 2018, Shannon answered and filed a counter-complaint for divorce requesting that Pamela's name be removed from Stacei's birth certificate. Shannon denied that Pamela "has any parental rights to the children" because she is not their biological parent. Pamela filed a motion for a temporary parenting plan on February 16, 2018 and answered Shannon's counter-complaint for divorce on February 20, 2018.

On March 21, 2018, Shannon filed a brief in the trial court asserting that Pamela did not have parental rights to the children because she had not taken the necessary steps to

---

[1] The circuit court's Memorandum Opinion and Order states that the parties were married on February 25, 2005; however, other pleadings and documents in the technical record, as well as two of the three briefs submitted, state that Pamela and Nicole were married on February 25, 2011. It appears that the trial court's order included the wrong date of marriage; however, this discrepancy does not affect the outcome of the case.

[2] We refer to the parties by their first names in this Opinion to avoid confusion and with no disrespect intended.

[3] The United States Supreme Court decided *Obergefell v. Hodges*, 576 U.S. 644 (2015) in June 2015 ruling that same-sex couples have the fundamental right to marry. Chevelle was born before that case was decided.

adopt them. She further argued that Tennessee's artificial insemination statute did not govern the case. On March 23, 2018, Shannon filed an affidavit signed by Mr. Compton stating, in relevant part:

> 3. That I believe myself to be the biological father of Chevelle and Stacei Harrison.
> 4. That I provided my sperm to the children's biological mother, Shannon Harrison.
> 5. That when I provided my sperm to Shannon Harrison, I did not sign any type of agreement waiving my parental rights, nor did I intend to waive my parental rights.
> 6. That I want to be part of my children's lives.
> 7. That I intend to file a Petition to establish myself as the father of these children.
> 8. That I believe it is in the best interest of the children that I be a part of their lives.

On January 25, 2019, Mr. Compton filed a motion to intervene in the Montgomery County Circuit Court "for the purpose of protecting his rights regarding the minor children." Attached to his motion was an order entered by the Juvenile Court for Montgomery County on January 18, 2019, establishing Mr. Compton as the biological parent of Chevelle and Stacei.[4] On January 29, 2019, Pamela filed 1) a response to the motion to intervene requesting an ex parte restraining order and 2) a motion for injunctive relief. In both motions, Pamela urged the circuit court to enjoin Shannon from allowing the children to visit Mr. Compton, who she asserted was "nothing more than a sperm donor." On January 31, 2019, Mr. Compton filed a response to Pamela's motion for injunctive relief and a response to Pamela's request for an ex-parte restraining order requesting the court to enter an order establishing him as the legal father of the children and to grant him parenting time. On February 22, 2019, the circuit court entered an Order granting Pamela visitation with the children. The court refused to order visitation with Mr. Compton; however, Shannon was allowed to "give [Mr. Compton] time with the minor children, just as she could a grandparent or babysitter during her time." By order entered February 26, 2019, the trial court allowed Mr. Compton to intervene as a party to the divorce proceeding.

Following a hearing on March 5, 2019, the trial court entered an order on March 13, 2019 providing visitation for Pamela and setting the case for "[a] review hearing for

---

[4] Apparently, the juvenile court was not made aware that there was a pending divorce and custody matter filed in the circuit court; however, according to the circuit court's Memorandum Opinion and Order, upon learning of the pending matter, the juvenile court later "overturned its order of parentage as to Mr. Compton."

argument of the case law" on "March 15, 201[9]." On May 24, 2019, the circuit court entered a Memorandum Opinion and Order stating:

> This cause came to be heard upon the *Complaint for Absolute Divorce*, filed by Pamela Estelle Harrison on January 24, 2018. Based on the testimony of the parties as well as Sheri Scott, Pamela Harrison's Mother, and Bobbi Hickman, Shannon Harrison's Mother and arguments of counsel and briefs provided by both counsel and argument and brief provided by intervening petitioner, Joseph Bryan Compton the Court finds as follows . . .

The court then made thirty numbered findings of fact including the following:

> 9. Mr. Compton lives approximately two blocks away from the Harrisons.
>
> 10. Mr. Compton was married at the time of the artificial insemination.
>
> 11. Mr. Compton and his wife agreed that he would donate sperm for the Harrisons.
>
> 12. Mr. Compton and Shannon Harrison (birth mother) never engaged in sexual intercourse.
>
> 13. The parties did not seek medical assistance in the artificial insemination.
>
> 14. On multiple occasions (for both children) Ms. Pamela Harrison drove over to Mr. Compton's house, collected a specimen in a urine cup and drove back to the Harrisons' house where she inseminated Ms. Shannon Harrison with Mr. Compton's sperm.
>
> 15. On some occasions, Ms. Shannon Harrison inserted the sperm into herself.
>
> 16. It was the intent of both parties (Pamela and Shannon Harrison) that these children would be their own and they would raise them as a family.
>
> 17. Mr. Compton never took on the role of a father to either of these children.
>
> 18. After the initial hearing in this matter on March 23, 2018, the Respondent contacted the sperm donor and offered him a rol[e] in the children's lives.
>
> 19. Ms. Shannon Harrison never had a conversation with Mr. Compton reference [sic] him being a father.

20. Ms. Shannon Harrison never had the intent for Mr. Compton to be a father figure to her children.

The court ultimately held:

Tennessee's artificial insemination statute as written applies to the parties and that the evidence shows that the parties intended to artificially inseminate Ms. Shannon Harrison and raise the children as a family. The Court finds that Mr. Compton was merely a sperm donor in the process with no intent to be a legal parent.

The record contains no transcript from the hearing and no statement of the evidence.

The trial court entered a second amended order on August 25, 2020 stating that it held a hearing on September 9, 2019, at which it considered "argument of counsel . . . testimony of the parties and witnesses[,] . . . exhibits submitted into evidence and the entire record." The court awarded an absolute divorce to Shannon and Pamela on the grounds of irreconcilable differences. When determining parenting time, the court considered the best interest factors at Tenn. Code Ann. § 36-6-106 and designated Shannon as the primary residential parent with 233 days of parenting time per year, and provided Pamela with 132 days of parenting time per year. The court reiterated that Mr. Compton is "not the legal father of the children . . . and has no right to visitation with said children."

Only Mr. Compton appeals, asserting that Tennessee's artificial insemination statute does not apply in this case and that Tenn. Code Ann. § 36-2-301(5) applies to establish him as the children's legal parent.[5] He also asserts the juvenile court was the more appropriate court to examine the case.

STANDARD OF REVIEW

The resolution of this case depends on the proper construction of Tennessee Code Annotated section 68-3-306. "Construction of a statute is a question of law which we review *de novo*, with no presumption of correctness." *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998) (citing *Roseman v. Roseman*, 890 S.W.2d 27, 29 (Tenn. 1994)); *see also Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010). Regarding our role in construing statutes, our Supreme Court has instructed as follows:

When interpreting statutes, our primary function is to carry out legislative intent without broadening the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn.

---

[5] Although Shannon essentially restates Mr. Compton's arguments in her brief, she did not file her own notice of appeal or raise additional arguments on her own behalf.

2002). When a statute is clear, courts simply apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). "When a statute is ambiguous, however, we may reference the broader statutory scheme, the history of the legislation, or other sources." *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008). We must presume that every word in a statute has meaning and purpose and should be given full effect so long as the obvious intention of the General Assembly is not violated by doing so. *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005) (quoting *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968)). "[A] construction which places one statute in conflict with another is to be avoided, and we must endeavor to resolve any possible conflict between statutes in favor of each other in order to provide a harmonious operation of laws." *Lovlace v. Copley*, 418 S.W.3d 1, 20 (Tenn. 2013) (citing *Graham v. Caples*, 325 S.W.3d 578, 582 (Tenn. 2010)).

*In re Baby*, 447 S.W.3d 807, 817-18 (Tenn. 2014). In addition, "[w]hen faced with a choice between two constructions, one of which will sustain the validity of the statute and avoid conflict with the Constitution, and another which renders the statute unconstitutional, we must choose the former." *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 529-30 (Tenn. 1993).

ANALYSIS

The primary issue in this appeal is whether Tenn. Code Ann. § 68-3-306 applies to establish Pamela as a legal parent of the children born during the marriage. Tennessee Code Annotated section 68-3-306 states: "A child born to a married woman as a result of artificial insemination,[6] with consent of the married woman's husband, is deemed to be the legitimate child of the husband and wife." The trial court held that Tenn. Code Ann. § 68-3-306 applies to establish Pamela as the legal parent of the children. In so holding, the trial court interpreted the artificial insemination statute in connection with Tenn. Code Ann. § 1-3-104(b) and the United States Supreme Court's opinion in *Obergefell v. Hodges*, 576 U.S. 644 (2015). Mr. Compton asserts that the artificial insemination statute should not apply to confer parentage because, in this context, "consent" requires an "express written agreement" and there was no written agreement between Pamela and Shannon regarding the artificial insemination. He further argues that Tenn. Code Ann. § 36-2-302(5) applies to establish him as the children's legal father in this case.

---

[6] "Artificial insemination" is defined as "[a] process for achieving conception, whereby semen is inserted into a woman's vagina by some means other than intercourse." *Artificial Insemination*, BLACK'S LAW DICTIONARY (11th ed. 2019). The method by which Shannon achieved her pregnancies comports with this definition.

We begin by reviewing the United States Supreme Court's landmark decision in *Obergefell v. Hodges*, 576 U.S. 644 (2015) because it bears on our interpretation of Tenn. Code Ann. § 68-3-306. In *Obergefell*, the United States Supreme Court held that "same-sex couples may exercise the fundamental right to marry," and that state laws are "invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite sex couples." *Obergefell*, 576 U.S. at 675-76. Importantly, and as relevant to this case, the *Obergefell* Court recognized the "constellation of benefits that the States have linked to marriage" includes:

> taxation; inheritance and property rights; rules of intestate succession; spousal privilege in the law of evidence; hospital access; medical decisionmaking authority; adoption rights; the rights and benefits of survivors; *birth and death certificates*; professional ethics rules; campaign finance restrictions; workers' compensation benefits; health insurance; *and child custody, support, and visitation rules*.

*Id.* at 670 (emphasis added). The Court further explained that because "States have contributed to the fundamental character of the marriage right by placing that institution at the center of so many facets of the legal and social order[,]" there should be "no difference between same- and opposite-sex couples with respect to [these rights]." *Id.*

Following *Obergefell*, the United States Supreme Court decided *Pavan v. Smith*, -- U.S. --, 137 S.Ct. 2075 (2017), a case that expounds upon and illustrates *Obergefell*'s commitment to extend the "constellation of benefits . . . linked to marriage" to same-sex couples. *Id.* at 2078. In *Pavan*, two married, same-sex couples who conceived their children through anonymous sperm donation sought to list both the birth mother and her same-sex spouse as parents on their children's birth certificates in Arkansas. *Pavan*, 137 S.Ct. at 2077. The Arkansas Department of Health refused to list the same-sex spouses on the birth certificates with the birth mothers. *Id.* The parents filed a lawsuit against the Arkansas Department of Health and sought a determination that the following statutory language applied to them: "[a]ny child born to a married woman by means of artificial insemination shall be deemed the legitimate natural child of the woman and the woman's husband . . . ." *Id.* (citing Ark. Code § 9-10-201(a) (2015)). The Arkansas Supreme Court concluded that this statute would not extend to same-sex couples. *Id.* at 2077-78. The United States Supreme Court reversed the judgment of the Arkansas Supreme Court holding that such "differential treatment infringes *Obergefell*'s commitment to provide same-sex couples 'the constellation of benefits that the States have linked to marriage.'" *Id.* at 2077 (citing *Obergefell*, 576 U.S. at 670). The Court held that under the challenged law, "same-sex parents in Arkansas lack the same right as opposite-sex parents to be listed on a child's birth certificate, a document often used for important transactions like making medical decisions for a child or enrolling a child in school." *Id.* at 2078. The Court went on to state:

Arkansas has thus chosen to make its birth certificates more than a mere marker of biological relationships: . . . [giving] married parents a form of legal recognition that is not available to unmarried parents. Having made that choice, Arkansas may not, consistent with *Obergefell*, deny married same-sex couples that recognition.

*Id.* at 2078-79. Thus, in *Pavan*, the Supreme Court made clear that same-sex couples are entitled to not only the symbolic recognition of marriage, but also to all of the benefits attendant to it.

With these principles in mind, we turn to Tenn. Code Ann. § 68-3-306 and its applicability to Pamela in this case. Tennessee's artificial insemination statute provides married couples who pursue artificial insemination a form of legal recognition by deeming the child born during their marriage to be their "legitimate child." Indeed, the Tennessee Supreme Court has acknowledged that the artificial insemination statute "*confers parental status* on a husband even though the child conceived in his wife via artificial insemination is not necessarily genetically related to him." *In re C.K.G.*, 173 S.W.3d at 728 (emphasis added). Construing Tennessee Code Annotated section 68-3-306 literally, in a non-gender-neutral manner, places it at odds with the United States Supreme Court's holdings in *Obergefell* and *Pavan* because it would deny same-sex married couples the same "constellation of benefits" that married opposite-sex couples enjoy. Specifically, it would deem a child born to a married woman as a result of artificial insemination to be the legitimate child of a male spouse of that woman but not the legitimate child of a female spouse of that woman. We are not constrained to this unconstitutional interpretation, however, because courts have a duty to construe a statute in a way that will sustain it and avoid constitutional conflict if such a reasonable construction exists. *See Davis-Kidd Booksellers, Inc.*, 866 S.W.2d at 529-30; *see also In re Swanson*, 2 S.W.3d 180, 186 (Tenn. 1999) ("We recognize that there are occasions in which it is appropriate to reject a literal reading of a statute when it would result in the statute being declared unconstitutional.").

Construing Tenn. Code Ann. § 68-3-306 in tandem with Tenn. Code Ann. § 1-3-104(b) will avoid constitutional conflict. *See Witt v. Witt*, No. E2017-00884-COA-R3-CV, 2018 WL 1505485, at *2 (Tenn. Ct. App. Mar. 27, 2018) (noting the Tennessee Attorney General filed a memorandum in defense of the constitutionality of Tenn. Code Ann. § 68-3-306 and interpreted it by employing Tenn. Code Ann. § 1-3-104(b)). Tennessee Code Annotated section 1-3-104(b) states that "[w]ords importing the masculine gender include the feminine and neuter, except when the contrary intention is manifest." By virtue of Tenn. Code Ann. § 1-3-104(b), and in light of the principles gleaned from *Obergefell* and *Pavan*, we hold that the word "husband" in Tenn. Code Ann. § 68-3-306 must be interpreted to include both the male and female genders. Therefore, section 68-3-306 applies in a gender-neutral manner to Pamela who was Shannon's wife during the artificial

inseminations, and both children born to Shannon via artificial insemination during her marriage to Pamela are "deemed" to be Pamela's "legitimate children."[7]

Next, we turn to Mr. Compton's argument that there must have been an "express written agreement" between Pamela and Shannon for the artificial insemination statute to apply. We find nothing in Tenn. Code Ann. § 68-3-306 that requires a written agreement between spouses for a child conceived through artificial insemination to be deemed a legitimate child of the marriage. The statute simply requires that the artificial insemination be performed "*with consent* of the married woman's husband." Tenn. Code Ann. § 68-3-306 (emphasis added). Mr. Compton urges this Court to turn to the adoption statutes, in a separate section of the Code, to define consent. *See* Tenn. Code Ann. § 36-1-102(15)(A), (B) (defining consent as "written" authorization or permission). However, if our legislature wished to require spouses engaging in artificial insemination to enter into a written agreement consenting to the procedure, it would have explicitly required one. *See, e.g.*, Tenn. Code Ann. § 36-2-403(a) (requiring a "written contract" when establishing embryo parentage prior to embryo transfer). Mr. Compton's arguments that consent must be in writing are not well taken. While written consent is not required, our Supreme Court has acknowledged that the artificial insemination statute "reflects a policy which favors taking into account *intent* in establishing parentage when technological assistance is involved." *In re C.K.G.*, 173 S.W.3d at 728 (emphasis added). The trial court considered intent when applying the artificial insemination statute to Pamela in this case and made the following pertinent findings of fact:

> 16. It was the intent of both parties (Pamela and Shannon Harrison) that these children would be their own and they would raise them as a family.
> . . .
> 20. Ms. Shannon Harrison never had the intent for Mr. Compton to be a father figure to her children.

Furthermore, the trial court held, "In this case, the evidence was clear and convincing that there was an oral agreement and that there was no intent by Mr. Compton to be the legal parent of the children." The court went on to expressly hold: "Mr. Compton was merely a sperm donor in the process with no intent to be a legal parent."

In his brief, Mr. Compton states, without any citation to the record, that the trial court did not permit him to testify regarding his intent to be in the children's lives. However, Mr. Compton's bald assertion is in contrast to the trial court's memorandum opinion and order entered on May 24, 2019 stating that its ruling was based on "the

---

[7] We note that this Court reached a different conclusion in *Pippin v. Pippin*, No. M2018-00376-COA-R3-CV, 2020 WL 2499633 (Tenn. Ct. App. May 14, 2020) when applying Tenn. Code Ann. § 68-3-306 to a same-sex couple that was not legally married. The case before us is distinguishable from *Pippin* because the women at the center of this case were legally married.

testimony of the parties" as well as "arguments of counsel and briefs provided by both counsel and argument and brief provided by intervening petitioner, Joseph Bryan Compton." Mr. Compton chose not to file a transcript or statement of the evidence in his appeal. It was his duty, as the appellant, to preserve and present us with a record that would allow us to address the issues he raises. *See* TENN. R. APP. P. 24. "[W]e will presume the evidence presented at trial supports the trial court's decision when no transcript or statement of the evidence is filed." *In re Estate of Vaughn*, 615 S.W.3d 133, 142 (Tenn. Ct. App. 2020) (citing *Irvin v. City of Clarksville*, 767 S.W.2d 649, 653 (Tenn. Ct. App. 1988)). The absence of a transcript or a statement of the evidence leaves Mr. Compton at a distinct and dispositive disadvantage of his own making. This Court has held:

> [W]here factual issues are raised, without an appellate record containing the facts, this court cannot perform a *de novo* review or determine the preponderance of the evidence. *Sherrod v. Wix*, 849 S.W.2d 780, 783 (Tenn. Ct. App. 1992). Therefore, in such cases, we assume that the record, had it been preserved, would have contained sufficient evidence to support the trial court's factual findings. *Id.*; *McDonald* [*v. Onoh*], 772 S.W.2d [913, 914 (Tenn. Ct. App. 1989)]; *Gotten v. Gotten*, 748 S.W.2d 430, 432 (Tenn. Ct. App. 1988); *Irvin*, 767 S.W.2d at 653.

*Aibangbee v. Aibangbee*, No. M2005-02598-COA-R3-CV, 2007 WL 1202409, at *2 (Tenn. Ct. App. Apr. 20, 2007). There is nothing in the record to suggest the circuit court prevented Mr. Compton from testifying or appearing to present argument in this case. Therefore, we are obligated to assume that the record, had it been preserved, would have contained sufficient evidence to support the trial court's holdings regarding the oral agreement that existed between Shannon and Pamela evidencing Pamela's consent to the artificial insemination. We must also presume there was sufficient evidence to support the court's finding that the intent of Shannon, Pamela, and Mr. Compton was that Mr. Compton donate his sperm and not be involved as a parent to the children. Indeed, he was not involved as a parent to the children after their births or in the years before Pamela filed for divorce from Shannon.

Mr. Compton next asserts that Tenn. Code Ann. § 36-2-302(5), which defines "parent" as "the biological mother or biological father of a child, regardless of the marital status of the mother and father" mandates a finding that he is the legal father of the children at issue. It does not. Tennessee Code Annotated sections 36-2-301 to -322, concern paternity and legitimation and were created to determine and establish "'the parentage of children born out of wedlock.'" *In re C.K.G.*, 173 S.W.3d at 724 (quoting Tape H-C & FA #1, *Tenn. H.R. Children and Family Affairs Comm.* (Mar. 26, 1997)). The children at issue in this case were born to a wedded couple. Furthermore, our Supreme Court has specifically considered the legislative history of Tenn. Code Ann. §§ 36-2-301 to -322 and has noted these statutes were not intended to apply with respect to sperm donors:

Significantly the legislative history shows that the current parentage statutes were not designed to control questions of parentage where sperm or egg donation is involved. In response to the observation that the new parentage statutes could potentially allow a sperm donor to file a parentage claim, Mr. Steve Cobb stated as follows:

> I can tell you that the clear intention, discussed intention, of this [bill] was *not* to deal with sperm donors at all. . . . [W]e wanted to put that off for another day. . . . The intent, and it should be stated by the sponsor in a colloquy on the floor if necessary is not to affect that issue *at all*.

*Id.* (quoting Tape S-Jud. #4, *Tenn. S. Judiciary Comm.* (May 13, 1997)) (emphasis in original). Our Supreme Court has explicitly noted that Tenn. Code Ann. § 68-3-306 operates to "confer[] parental status." *In re C.K.G.*, 173 S.W.3d at 728. Therefore, pursuant to Tennessee Code Annotated section 68-3-306 the children born during Pamela and Shannon's marriage were "deemed to be" their legitimate children. This means that Mr. Compton does not have a legally cognizable relationship or legal status with respect to Chevelle and Stacei.[8] As the trial court held, Mr. Compton was a "sperm donor," and Pamela and Shannon are the children's legal parents. Accordingly, Mr. Compton is not entitled to visitation with the children.

Finally, Mr. Compton suggests that the "juvenile court is a proper court to address the rights of parents when a child is being born out of wedlock." As we have noted, the children at issue in this case were not born out of wedlock. Rather, the children were born to Pamela and Shannon who were legally married at the time the children were born. The issues presented in this case arose during the course of a divorce proceeding. Divorce proceedings are to be heard in the circuit or chancery court in the county where the parties reside, and issues regarding custody of children are to be resolved in the same venue. Tenn. Code Ann. § 36-4-105(a) ("The bill or petition may be filed in the proper name of the complainant, in the chancery or circuit court or other court having divorce jurisdiction in the county where the parties reside at the time of their separation . . . ."); Tenn. Code Ann. § 36-6-106 ("In a suit for . . . divorce . . . or in any other proceeding requiring the court to

---

[8] Mr. Compton has not cited to any Tennessee statute or Tennessee precedent allowing a child to have more than two legal parents, and we have found none. The Court notes, however, that other states have enacted legislation to allow for more than two parents. *See, e.g.*, Cal. Fam. Code § 7612(c) (West 2020) ("In an appropriate action, a court may find that more than two persons with a claim to parentage under this division are parents if the court finds that recognizing only two parents would be detrimental to the child."); Me. Rev. Stat. Ann. tit. 19-A, § 1853 (West 2016) ("Consistent with the establishment of parentage under this chapter, a court may determine that a child has more than 2 parents.").

make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child."). There was no error in the circuit court's exercise of jurisdiction in this case.

CONCLUSION

For the foregoing reasons, we affirm the trial court in all respects. Costs of the appeal are assessed against the appellant, Joseph Bryan Compton, for which execution may issue if necessary.

_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE